Larry Williams WHITSEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 1121–87.

Court of Criminal Appeals of Texas,
En Banc.

May 10, 1989.
Rehearing Granted Nov. 8, 1989.
On Rehearing Sept. 19, 1990.

**709**

Penal Code, § 30.02(a)(1). The trial court assessed punishment at 99 years imprisonment in the Texas Department of Corrections. The Fourteenth Court of Appeals abated appellant's appeal and ordered the trial court to conduct a hearing on the *Batson*[1] issue raised by appellant on appeal. Upon receipt of the transcript of the *Batson* hearing, the Court of Appeals addressed appellant's points of error and affirmed his conviction in an unpublished opinion. *Whitsey v. State*, No. C14–85–530–CR, 1987 WL 15052, delivered July 30, 1987. Appellant then petitioned this Court for discretionary review. We originally denied appellant's petition but granted his motion for rehearing on the *Batson* issue. We will reverse the judgments of the trial court and the Court of Appeals.

After the voir dire of the jury panel was completed, but before the jury was sworn, appellant's counsel objected to the jury on the ground that the prosecutor had used his peremptory challenges to exclude blacks from the jury and that denied appellant "his right to a fair cross-section of the community". Appellant's counsel stated for the record that there were seven blacks in the first forty venirepersons, that the first black veniremember was struck for cause, that the remaining six blacks on the venire were struck peremptorily by the State, and that the State used six of its ten peremptory challenges to strike the blacks from the jury panel. Counsel then also objected that appellant was being denied his due process. The trial court overruled appellant's objections and swore in the jury.

After appellant's conviction on March 11, 1985, he filed a motion for new trial and an amended motion for new trial in which he alleged he was not tried by a jury of his peers because the prosecutor's strikes were racially motivated (a *Batson* claim), and that the prosecutor used peremptory challenges to systematically exclude blacks from jury panels (a claim based on *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)).[2] A hearing was held

Stanley G. Schneider, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Kathlyn Giannaula and Bob Stabe, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

Appellant was convicted by a jury of the offense of burglary of a habitation with intent to commit sexual assault. V.T.C.A.

---

**1.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**2.** The *Batson* case had not been decided at the time of this hearing on the amended motion for

on appellant's amended motion for new trial on May 30, 1985. At the hearing, appellant's counsel attempted to question the prosecutor about his reasons for striking the blacks from appellant's jury panel. The State's attorney at the hearing objected to any inquiry as to the prosecutor's "individual reasoning process in this case" on the basis of *Swain, supra,* and the trial court sustained that objection thereby preventing appellant from determining why the prosecutor struck the black venirepersons in his trial. The trial judge, however, allowed appellant's counsel to question the prosecutor about his use of peremptory challenges in other cases and Harris County prosecutors' use of peremptory challenges in general in the past. At the conclusion of the hearing, appellant's counsel argued to the court that the present state of the law allowed him to question an individual prosecutor as to his use of peremptory challenges in a particular trial to determine whether a defendant was denied a fair trial. The State waived any argument, and the trial judge denied the amended motion for new trial. Appellant's counsel gave notice of appeal.

■ The Fourteenth Court of Appeals abated the appeal on March 26, 1987, and ordered the trial court to conduct a hearing "to provide the prosecutor with an opportunity to rebut appellant's prima facie showing of purposeful discrimination", i.e., a *Batson* hearing.[3] In its order, the Court of Appeals concluded appellant established a prima facie showing of purposeful discrimination in the motion for new trial hearing. The Court of Appeals concluded, however, that the prosecutor was not afforded the opportunity to rebut appellant's prima facie case and offer racially neutral reasons for the exercise of the peremptory challenges against the black venirepersons. Nor was the Court of Appeals satisfied that appellant could not present evidence rebutting any neutral explanations offered by the State. Thus, the Court of Appeals ordered the trial court to conduct a *Batson* hearing and held the appeal in abeyance pending the filing of the statement of facts from the hearing and the findings of fact and conclusions of law of the trial judge.

■ We first note that the record supports the Court of Appeals' decision that appellant established in the motion for new trial hearing a prima facie showing of purposeful discrimination by the prosecutor in his exercise of peremptory challenges.[4] The record reflects that appellant is a black man and that no blacks served on appellant's jury. Also, of the seven black persons that were on the jury panel, one was struck for cause and the remaining six were peremptorily struck by the prosecutor. At the hearing on the motion for new trial, the prosecutor testified that he questioned only one of the six black members of the jury panel, who was struck for cause, but he had conducted a general voir dire of the panel and did not ask many questions of individual venirepersons. An inference of discriminatory purpose in the prosecutor's use of peremptory challenges is supported by the totality of these facts.

After the *Batson* hearing on June 5, 1987, the trial judge entered the following findings of fact and conclusions of law:

"1. The Complainant was black, but the State's only two identification witnesses were white police officers.

2. The only black jury question by either State of (sic) Defense related to that

---

new trial. Appellant's amended motion for new trial, therefore, did not specifically cite the *Batson* case, but the record indicates appellant's counsel anticipated such a holding, as the *Batson* case was granted certiorari during these hearings, and formed his objections in compliance therewith. Appellant's motion also did not cite *Swain, supra,* but was phrased in language from that case.

3. Since appellant's case was pending on direct review at the time the *Batson* case was decided,

the *Batson* decision is applicable to it. See *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

4. Although the Court of Appeals made the right decision regarding appellant's prima facie showing of purposeful discrimination, the proper procedure is for the trial court to decide whether appellant made such a showing. *DeBlanc v. State,* 732 S.W.2d 640 (Tex.Cr.App.1987).

juror's friendship with several police officers.

3. Prosecutor Stabe did not ask any questions of any of the six black jurors, nor did he question individually any of the other jurors on the panel.

4. Prosecutor Stabe did not have an independent recollection as to the basis of his strikes at the time of the hearing of a Motion of New Trial in May of 1985.

5. Prosecutor Stabe spent six to eight hours refreshing his memory from the actual voir dire and the Motion for New Trial hearing to develop his explanations for his strikes.

6. Prosecutor Stabe used ethnic, religious and job related stereotypes as a basis for his 'neutral explanation.'

7. Prosecutor Stabe, during the jury selection, identified each of the six black jurors on his information sheet by writing the letters 'B' (sic) above their names.

8. The Assistant District Attorney Bob Stabe represented the State of Texas in the trial of [appellant].

9. That Bob Stabe exercised all ten of his peremptory challenges afforded him by Article 35.15(b) of the Texas Code of Criminal Procedure.

10. That Bob Stabe exercised a peremptory challenge on venireperson number 3, John Wesley Wauson, a white male, because he was an attorney and stated that in his opinion the State's burden of proof was a difficult burden.

11. That Bob Stabe exercised a peremptory challenge on venireperson number seven, Gloria Wright Mitchell, a black female, because she engaged in a dialogue with the defense attorney, nodded with the statements of the defense attorney, and, in Bob Stabe's mind, appeared to have a problem with the credibility of police officers in general.

12. That Bob Stabe exercised a peremptory challenge on venireperson number eight, Sherry Lynn Ramsey, a black female, because of her age of twenty-four years and because her husband was employed as a nurses' assistant.

13. That Bob Stabe exercised a peremptory challenge on venireperson number twenty-four, Maurine Anita Fuller, a black female, because of her occupation as a teacher and that in Mr. Stabe's opinion teachers tend to be liberal and forgiving.

14. That Bob Stabe exercised a peremptory challenge on venireperson number thirty, Carol L. Mireles, a white female because of her occupation as a teacher.

15. That Bob Stabe exercised a peremptory challenge on venireperson number thirty-two, Glenda Kaye Johnson, a black female, because of her religious preference, namely, Pentacostal. In Mr. Stabe's opinion those of the Pentacostal faith tend to look to their religion to make decisions and sometimes feel that they speak in tongues, therefore, becoming a fringe religious group.

16. That Bob Stabe exercised a peremptory challenge on venireperson number thirty-five, Willie Lee Hunt, a black male, because of his religious preference, namely, Church of God, and because of an unanswered question on his jury information card. Specifically, Mr. Stabe testified that he has never heard of the Church of God religion and is unaware of how those beliefs may influence a decision by Mr. Hunt.

17. That Bob Stabe exercised a peremptory challenge on venireperson number thirty-six, Virgil James Thompson, a white-male, because of his occupation as a hair-stylist, his length of time on the job of three months, and that, in Mr. Stabe's mind, he appeared to be homosexual.

18. That Bob Stabe exercised a peremptory challenge on venireperson number thirty-eight, Edward H. Rosen, a white male, because of his being of the Jewish faith and from Baltimore, Maryland, both traits indicating a liberal nature.

19. That Bob Stabe exercised a peremptory challenge on venireperson number thirty-nine, Reginald Bernard Ardoin, a black male, because of his age of 21 years and because he appeared to be illiterate in that he could not spell his

religious preference of Baptist nor his place of birth.

20. That the crime that [appellant] was accused of committing was not interracial.

## CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the Court has arrived at the following conclusions of law;

1. That the State, through his Assistant District Attorney, Bob Stabe, stated he had neutral reasons for the exercise of six peremptory strikes on the six black venirepersons, and

2. That the appellant did not rebut the State's explanations.

3. That the appellant did not prove by a preponderance of the evidence that Bob Stabe engaged in purposeful discrimination in the selection of the petit jury through the use of his peremptory challenges."

The trial judge then concluded that appellant was not denied the equal protection of the law by the prosecutor's use of his peremptory challenges.

Upon receipt of the transcript and the statement of facts from the *Batson* hearing, the Court of Appeals addressed appellant's three points of error; however, only the disposition of the first point of error concerns us here. The court of appeals concluded that the findings of the trial court, that the reasons for the peremptory challenges were racially neutral and that the prosecutor did not purposefully discriminate against appellant, were not clearly erroneous and, therefore, overruled appellant's first point of error. *Whitsey,* supra, slip opinion at p. 2. The Court of Appeals stated:

Appellant contends that ethnic, religious and job-related stereotyping cannot be a neutral explanation. We do not perceive it to be our function to judicially weigh reasons for peremptory strikes other than those that are constitutionally precluded. The very nature of peremptory strikes is to afford both sides the leeway to eliminate prospective jurors from the trial that they perceive as adverse to their respective interests. For us to interfere with this process, other than when it constitutes specific discrimination as ennunciated (sic) by the Supreme Court, would be destructive of our system of peremptory challenges in criminal cases. If this area of constitutional examination as to peremptory challenges is to be further broadened to include occupational, political, and religious areas, the Supreme Court must make that expansion. We do not construe *Batson* and prior decisions to have made such an extension. Further, we believe that an unlimited broadening of such inquiry would be fatal to the peremptory challenge system so long entreached (sic) in our jurisprudence.

We do not agree with the Court of Appeals' opinion.

We initially note that the Court of Appeals applied the wrong standard for review of the trial judge's findings. In *Keeton v. State,* 749 S.W.2d 861 (Tex.Cr.App. 1988) (Opinion Following Abatement) (Hereinafter cited as *Keeton II*), wherein we thoroughly discussed the *Batson* decision and its progeny, we specifically rejected the "clearly erroneous" standard. *Keeton II*, at 870. Instead, we considered the evidence in the light most favorable to the trial judge's rulings and determined whether the record supported the findings of the trial judge. If there is sufficient evidence to support the trial judge's finding of no purposeful discrimination, the findings will not be disturbed on appeal. In *Keeton II* the finding of the trial judge that the prosecutor's strikes were not based solely on the juror's race was amply supported by the record at trial and at the *Batson* hearing. See *Keeton II* at 870. The Court of Appeals erred in the instant case by applying a clearly erroneous standard in overruling appellant's point of error.

■ Furthermore, the Court of Appeals is incorrect in its perception of its role as an appellate court when presented with a *Batson* issue. The Court of Appeals apparently finds that it is appropriate to interfere with the peremptory challenge system only when the exercise of a strike is

"constitutionally precluded", and that otherwise we should not question the rationale for the strike of a prospective juror. From the language of the Court of Appeals' opinion, it appears that the Court would only review the exercise of a peremptory challenge where there is a blatant constitutional violation, such as where a prosecutor states "I struck that prospective juror because he is black." Limiting our review to the exercise of such a challenge ignores the reality that the peremptory challenge system permits discrimination by those "who are of a mind to discriminate." [5] As Justice Marshall stated in his concurring opinion in *Batson*, 106 S.Ct. at 1728:

> [I]t is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal. [citation omitted] A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported.

See e.g. *Daniels v. State*, 768 S.W.2d 314 (Tex.App.—Tyler 1988), pet. refused March 1, 1989. Moreover, the Court of Appeals refused to accept appellant's contention that ethnic, religious and job-related stereotyping cannot be neutral explanations for striking black veniremembers and concluded that the *Batson* decision did not countenance such an inquiry. We do not interpret *Batson*, supra, to be limited to review of constitutionally precluded rationales for exercise of peremptory challenges. Implicit in the *Batson* decision, so as to promote equal protection of the law, is the provision that we must examine every reason given by the prosecutor for the strike of a black veniremember within the circumstances of that particular case to determine whether the "neutral explanation" for the strike is really a pretext for a racially-motivated peremptory challenge. Thus, we are not

limited to reviewing constitutionally precluded strikes, as the Court of Appeals concludes, but we are required to review the rationale for each strike which an appellant prima facially establishes is racially-motivated in spite of the seemingly neutral rationale offered by the prosecutor.

After reviewing the record in this cause, we do not find that the findings and conclusions of the trial judge and the holding of the Court of Appeals are supported by the record. Although the prosecutor's explanations for the exercise of his peremptory challenges are racially neutral on their face, the evidence presented by appellant in rebuttal at both the motion for new trial hearing and the *Batson* hearing weighs against a finding that these explanations were actually racially neutral.

■ As stated by the Supreme Court in *Batson*, supra, the prosecutor must "articulate a neutral explanation related to the particular case to be tried." *Batson*, 106 S.Ct. at 1723. That requirement, however, is not sufficient to overcome appellant's prima facie showing of purposeful discrimination. The prosecutor must give "clear and reasonably specific" explanations of "legitimate reasons" for his use of peremptory challenges. *Batson*, 106 S.Ct. at 1722–1724 and n. 20. Such a requirement mandates that the trial judge evaluate the reasons given by the prosecutor in light of the circumstances of that trial to determine whether the explanations are merely a pretext. In *Keeton II*, we discussed a nonexclusive list of factors which weigh against the legitimacy of a race-neutral explanation. The presence of any *one* of these factors tends to show that the State's reasons are not actually supported by the record or are an impermissible pretext. Those factors, which we employ in our analysis today, are:

> 1. The reason given for the peremptory challenge is not related to the facts of the case;

---

**5.** *Batson*, 106 S.Ct. at 1723, citing *Avery v. Georgia*, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953).

2. there was a lack of questioning to the challenged juror or a lack of meaningful questions;

3. Disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck;

4. Disparate examination of members of the venire, i.e., questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members; and

5. an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.

See *Keeton II* at 866, citing *Slappy v. State*, 503 So.2d 350 (Fla.Dist.Ct.App.1987), affirmed 522 So.2d 18 (Fla.1988).

The record from the *Batson* hearing indicates that both the complainant and appellant were black and that there were seven blacks on appellant's jury panel. There were ten persons on the jury panel who had friends or relatives in law enforcement. Of these ten people, who the prosecutor conceded generally make good state's jurors, only two were black, and both these persons were struck by the State. Appellant's attorney struck five of these people (all white), and the three remaining served as jurors. Upon reviewing the voir dire transcript, the prosecutor recalled his reasoning for striking Gloria Mitchell, one of the blacks struck from the panel, and stated that he struck her because she seemed to nod in agreement with what appellant's attorney stated during voir dire, and also because:

> The conversation or the questioning between [appellant's counsel] and Mrs. Mitchell dealt with any friends or relatives that Ms. Mitchell had in law enforcement, and Ms. Mitchell indicated that she had friends in the Houston Police Department vice division and also Department of Public Safety. [Appellant's counsel] asked on two different occasions whether that would influence her or whether, I believe, a police officer, a witness that was not a police officer, and my recollection of what bothered me about Ms. Mitchell is her answers were not just no but were, "Oh, no." And I

> don't recall the wording of the second answer but the tone of the answers as best I recall were such that it would be the last thing in her mind that she would ever think of believing a police officer than a nonpolice officer witness. In my jury selection I had two Houston police officer witnesses that were critical to the case and it bothered me in that Ms. Mitchell may have for some reason, because of her experience with Houston police officers at vice, may have reasons not to believe police officers based on the general tone and answers to questions of [appellant's counsel.]

The prosecutor admitted that the only notes he had taken on the juror information sheets regarding Mitchell and Glenda Johnson, the other black venireperson with friends in law enforcement who was struck for religious reasons (see discussion below), were "pro-state notes" and the letter "B" indicating that these venirepersons were black.

The prosecutor also testified that he struck certain venirepersons because of their religious background. On the juror information sheets the prosecutor circled, so as to note its significance, the religious preference of only two of the venirepersons, both of whom were white. One of these two prospective jurors, a Quaker, was not struck for religious reasons but was struck for cause. The other venireperson, a member of the Jewish faith, was peremptorily struck by the State because the prosecutor opined that he was liberal. As to the black venirepersons who were peremptorily challenged because of their religious preference, the prosecutor made no notes or circles on their juror information sheets regarding their religion, but he did indicate their race with a "B", denoting they were black.

The prosecutor also stated that he struck prospective jurors because of their occupation. The prosecutor peremptorily challenged two women, a hispanic and a black, because they were teachers, and the prosecutor stated that in his opinion teachers tend to be liberal and forgiving. The prosecutor noted the occupation of each woman on the juror information sheets by circling

it. When questioned by appellant's counsel as to why he struck the black teacher, the prosecutor stated "First off, [this prospective juror] was a black female and I struck [her] primarily because she was a teacher." The prosecutor also indicated her race on the juror information sheet with the designation "B", as he did with a third prospective black juror who was struck because of her *husband's* occupation and her age. This juror's husband was employed as a nurse's assistant. As the prosecutor explained that he tends to strike nurses from jury panels because they tend to be liberal, the trial judge interrupted him and the following dialogue occurred:

THE COURT: Nurses are liberals?

THE WITNESS (prosecutor): On certain cases I might keep a nurse, Your Honor, but in general I tend to strike nurses, yes.

THE COURT: Nurses, you think, would be liberal in a case where a person's charged with burglary with intent to commit sexual assault?

THE WITNESS: On a case such as this, well, on child abuse cases I tend to keep a nurse and, in fact, teachers also on those kind of cases. On cases such as this, in general my feeling is while this was a rape case that nurses in general tend to be on the liberal side.

THE COURT: You don't think nurses side with victims of rape, sexual assault? I'm just asking your opinion.

THE WITNESS: In some cases, yes, sir. In this case I didn't have much of an opportunity to have any individual questioning on voir dire[6] and the question was a problem that arose in by mind with [the prospective juror], it was not that she was a nurse but her husband had only been at the job six months and was a male and as typically in the past been a female profession and my opinion was that she may have too much of a social worker's type philosophy or attitude that might be conveyed to her, I think—I still kind of believe that husbands' ideas in general conveyed to their wives probably more so than vice versa. That was my feeling.

THE COURT: Okay....

The prosecutor's notes on this prospective juror consisted only of the letter "B", indicating the race of the juror, and nothing was marked or circled as to the juror's age or her husband's occupation.

Finally, the prosecutor testified at the *Batson* hearing that he struck two black jurors, including the prospective juror mentioned above, because of their age. Again, the prosecutor made no specific notations on the juror information sheets regarding these two individuals except to note their race with the letter "B". The prosecutor stated that he struck Sherry Ramsey, the venireperson discussed in the preceding paragraph, because her age, 24, was the approximate age of appellant. The prosecutor, however, did not strike six other *white* veniremen who were also the approximate age of appellant. Those six persons, who ranged in age from 25 to 28 years, served on appellant's jury.

Several of the factors discussed in *Keeton II* and *Slappy*, supra, which weigh against the legitimacy of a race-neutral explanation, are present in this cause. As noted in *Keeton II*, these factors may be used as evidence to show that the State's neutral explanations are merely a sham. In analyzing this evidence, we first note that the record reflects that the prosecutor did not ask *any* questions of the blacks on the jury panel whom he struck even though there were items on the jury information sheets relating to those jurors which either concerned him or had been deleted.

The prosecutor's peremptory challenges exercised against certain black venirepersons were based on reasons equally applicable to white veniremembers who were not challenged by the prosecutor. The State struck two blacks from the venire because they were close in age to appellant but did not strike any of the six white

---

**6.** The prosecutor did not object, however, to the amount of time, or lack thereof, for voir dire. The reason for the short voir dire is not clear in the record. A trial judge may impose reasonable restrictions on the exercise of voir dire examination. *Ratliff v. State,* 690 S.W.2d 597 (Tex.Cr.App.1985).

venirepersons who were also close in age to appellant. Additionally, there were eleven venirepersons who had friends in law enforcement, only two of whom were black, and they were the only "friends" of law enforcement struck by the State.

The prosecutor's reasoning for striking one black female who was a teacher was based on a group bias not shown to apply to the challenged juror. The prosecutor opined that this prospective juror was "liberal" because of her occupation. The prosecutor also stated that he struck another black female because he believed she was liberal because of her husband's occupation as a nurse's assistant. The prosecutor, however, did not ask any questions of either juror which he peremptorily challenged; nor did these jurors respond to any questions by defense counsel. The record of the voir dire is devoid of any testimony which indicates that these two black prospective jurors were "liberal" because of their occupation. This reason appears to be a classic example of "an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically." *Keeton II* at 866.

■■■ Although the prosecutor articulated nondiscriminatory reasons for striking the blacks from the venire, the trial judge cannot merely accept those explanations at face value and end the *Batson* inquiry. The trial judge must determine whether these facially neutral explanations are contrived to avoid admitting acts of discrimination. See *Keeton II* at 868, wherein we approved the analysis in *State v. Antwine*, 743 S.W.2d 51 (Mo.1987). The facts of the case, the circumstances of the voir dire, and the testimony at the motion for new trial hearing and the *Batson* hearing are relevant to this determination. Besides the rebuttal evidence presented by appellant, his counsel established on cross-examination of the prosecutor at the *Batson* hearing that since the Court of Appeals' order on March 26, 1987, abating the appeal, the prosecutor had spent six to

7. See *Keeton II* at n. 1.

8. See note one of Judge Teague's concurring

eight hours reviewing the voir dire transcript and that is when he came up with his explanations for his voir dire strikes.

From this review of the record, we determine that the trial judge's findings concerning the prosecutor's explanations for the exercise of his peremptory challenges against the black venirepersons are not supported by the record and that the prosecutor's explanations are insufficient as a matter of law to rebut appellant's prima facie showing of racial discrimination in the selection of his jury. We recognize that a finding of purposeful discrimination is a finding of fact based largely upon the trial judge's evaluation of credibility and that a reviewing court should accord such a finding great deference. Considering the evidence in the light most favorable to the trial judge's findings, however, and in light of the entire record,[7] we cannot accord the trial judge's findings such deference in this cause.

■■■ We conclude that appellant has established that the prosecutor exercised peremptory challenges based solely on race. The exclusion of even one member of appellant's race from the jury panel for racial reasons invalidates the entire jury selection process.[8] Having been denied due process in the jury selection process, appellant is therefore entitled to a new trial.

Accordingly, we reverse the judgments of the Court of Appeals and the trial court and remand this cause to the trial court so that appellant may have a new trial.

CAMPBELL, J., concurs in the result.

BERCHELMANN, Judge, dissenting.

In *Keeton v. State*, 749 S.W.2d 861, 870 (Tex.Cr.App.1988) (opinion following abatement), we articulated the appropriate standard for review of the trial court's findings in a *Batson* hearing: viewing the evidence in the light most favorable to the court's holdings, appellate courts are to defer to the trial court's findings and conclusions where supported by the record. In the

opinion in *Keeton II* at 871.

case at bar, a majority of this Court acknowledges this to be the appropriate standard, but yet fails to apply it to the facts of the case. Inexplicably, the majority's analysis omits much of the evidence supporting the trial court's determination of a lack of purposeful discrimination. Accordingly, I respectfully dissent.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court relaxed the evidentiary standard previously articulated in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), by which a criminal defendant could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment, based upon the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire. Under *Batson*, supra, once the defendant makes a prima facie showing, the burden shifts to the State to advance race neutral explanations for the challenges. *Id.*, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. In the case at bar, the burden shifted to the State upon appellant's showing that the prosecution exercised peremptory challenges to strike all six of the black veniremembers. Viewing the evidence in the light most favorable to the trial court's findings, the record clearly supports the conclusion that the State rebutted the presumption of purposeful discrimination. *Keeton*, supra.

I.

The prosecutor's voir dire notes provides a most glaring example of the majority's failure to view the evidence in the light most favorable to the trial court's findings. Specifically, the majority repeatedly treats the prosecutor's indication of the race of the black veniremembers on the juror information forms as evidence controverting the trial court's findings. However, at the *Batson* hearing the prosecutor explained that he marked "B" on the juror information forms *not* for purposes of peremptory strikes, but rather for purposes of visual placement of the members on the panel. He explained the notations in the following manner:

... it helps a lot just in placing faces and placing jurors, not just placing the minority jurors but when you are sitting in front of a panel with 50 people trying to figure out who juror No. 26 is, frankly, looking at my sheet, I know that Juror No. 26 is two down from the black female that at the time would have been in the third row. That's pretty much the basis for laying out, I guess, landmarks of sorts in the entire jury panel.

\*    \*    \*    \*    \*    \*

It'd be helpful, more helpful after all the voir dire when I'm sitting up at counsel table when I look up and refresh my memory of faces of what people have done during the voir dire.

Further evidence logically supports the prosecutor's explanation that the "B" notations were not marked to assist in peremptory strikes based solely on race. Even the majority opinion recognizes that the prosecutor made other notations on several of the juror information forms which were marked with "B." Professions were circled, unanswered portions of the forms were marked, and veniremember statements made during voir dire were noted. It follows that the prosecutor would not have wasted precious voir dire time making these notations had he been of a mind to automatically exercise his peremptory challenges against the black members of the panel. In any event, it is unquestionable that the trial court could have reasonably treated the "B" notations on the juror information cards as not indicating purposeful discrimination.

Ironically, the majority treats the prosecutor's notes scribbled on the forms of some of the black panel members as indicia of purposeful discrimination. The majority reaches this conclusion because there were no specific questions addressed to these veniremembers.

"In analyzing this evidence, we first note that the record reflects that the prosecutor did not ask *any* questions of the blacks on the jury panel whom he struck even though there were items on the jury information sheets relating to those jurors which either concerned him

or had been deleted." At 715 (emphasis in original).

While it is true that the prosecutor did not question the black panel members individually, the trial court's findings state that the prosecutor did not question individually *any* of the fifty panel members. The record reflects that the trial judge limited the prosecution to forty minutes for both general and individual voir dire and the prosecutor did not, in fact, individually question *any* juror, black or white, regarding any information noted on the information forms, and that similar notes were jotted on the forms of white venire-members.

Without explanation, the majority fails to address the prosecutor's reasons for marking "B" on the black veniremembers information forms, opting instead to repeatedly cite this as evidence which controverts the trial court's findings. I find this information insufficient to overcome the deference We are required to give the trial court's findings. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21, 90 L.Ed.2d at 89 n. 21; *Keeton*, 749 S.W.2d at 870. Moreover, the additional notations on these forms indicate a propensity not to strike a veniremember solely because of race when viewed, as we must, in the light most favorable to the court's findings. *Keeton*, supra.

Additionally, the majority unfairly implies that the prosecutor concocted his reasons for exercising peremptory strikes because appellant demonstrated that "the prosecutor spent six to eight hours reviewing the voir dire transcript and that is when he came up with his explanations for his voir dire strikes." At 716. The prosecutor admitted that he reviewed his notes and the voir dire transcript to refresh his memory; otherwise, he would not have been able to recall the circumstances surrounding this case. The prosecutor answered affirmatively to defense questioning that it was after refreshing his memory that he "came up" with the reasons for his strikes.

The necessity for a prosecutor to go back months, perhaps years, after a trial to demonstrate his reasons for exercising a peremptory challenge is a problem inherent with the retroactive application of *Batson v. Kentucky*, supra. See *Griffith v. Kentucky*, 479 U.S. 314, 333, 107 S.Ct. 708, 719, 93 L.Ed.2d 649, 665 (1987), (White, J., Rhenquist, C.J., and O'Connor, J. dissenting). See also *Allen v. Hardy*, 478 U.S. 255, 260, 106 S.Ct. 2878, 2881, 92 L.Ed.2d 199, 206–06 (1986). It is unfair to imply that the prosecutor fabricated his reasons simply because he had to refresh his memory twenty-six months after trial. More importantly, it should not be treated as evidence which controverts the trial court's findings.

## II.

Because the majority fails to set out the prosecutor's reasons for striking each of the black veniremembers, I will individually address each strike to demonstrate the evidence supporting the court's finding of no purposeful discrimination. Veniremember No. 7, Gloria Mitchell, was the first black panel member peremptorily struck. The prosecutor scribbled on her juror information card "HPD," "Vice" and "DPS." The prosecutor testified at the *Batson* hearing that these notes indicated that Mitchell had friends in the police department and department of public safety, which would normally make her a good state's juror. However, Mitchell's responses to defense voir dire questioning, particularly her intonation, left the prosecutor questioning whether she would believe an officer's testimony. In essence, he was concerned that Mitchell's connection with some law enforcement officials might predispose her to disbelieve the police witnesses crucial to the case at bar. The trial judge, who presided over the original trial and the *Batson* hearing, found the prosecutor's explanation race-neutral. The majority essentially rejects the court's finding and the prosecutor's reasoning because the prosecutor did not strike white veniremembers who had friends in law enforcement. In reality, there is ample evidence to support the trial judge's finding that veniremember No. 7 was not struck in a discriminatory manner.

Next, the State exercised a peremptory challenge against black veniremember No.

8, Sherry Ramsey. The prosecutor testified that he probably struck Ramsey because of her husband's profession. Additionally, he expressed concern about her youth; she was twenty-four year of age.[1] After much questioning, cross-examination and re-direct examination, the prosecutor explained that, in his opinion, nursing is a liberal profession and people involved in nursing are prone to a "social worker's type attitude." He felt that because this was a sexual assault case, Ramsey might have been a good juror if *she* were a nurse. However, he felt that because she married a man who works in a predominately female profession and who is probably a "social worker type," she would probably not be a good state's juror. Admittedly, the prosecutor's logic may be strained, but viewed in the light most favorable to the court's finding of no purposeful discrimination, this testimony supports the finding of the trial judge, who, by presiding over the trial and the *Batson* hearing, was in the best position to assess the credibility of the witnesses.

The prosecutor struck veniremember No. 24, Maurine Fuller. On her juror information form, the prosecutor circled Fuller's occupation of teaching, and noted her failure to fill out whether she served on a prior jury. He testified that he struck Fuller because he viewed teachers to be too liberal and forgiving. The record reflects that the prosecutor also struck the only other teacher on the panel, a nonblack. Despite the trial court's finding that Fuller was peremptorily struck for race-neutral reasons, the majority concludes that the prosecutor acted "on a group bias not shown to apply to the challenged jurors." At 715.

In so holding, the majority misapplies a factor articulated by a Florida court for determining whether a prosecutor's reason for exercising a peremptory strike is a mere pretext for racial discrimination. *Slappy v. State,* 503 So.2d 350 (Fla.Dist.Ct. App.1987), *aff'd,* 522 So.2d 18 (Fla.1988). Under such circumstances, if a prosecutor claims he or she struck a veniremember because of employment, in the absence of other evidence, the reason becomes suspect. In the instant case, the prosecutor struck a teacher who is not black, as well veniremember Fuller, who is black. The lack of disparity in treatment of these otherwise similarly situated veniremembers negates any inference of racial discrimination.

The prosecutor exercised a peremptory challenge to strike Glenda Johnson, veniremember No. 32. He testified that he did so because Johnson indicated that Pentecostal was her preferred religion. This bothered the prosecutor because he believed this to be a "fringe type" religion because they "speak in tongues" and do some things "out of the ordinary." No other veniremember indicated involvement in the Pentecostal Church. The record supports the trial judge's finding that this reason was race-neutral.

Additionally, the prosecutor peremptorily struck veniremember No. 37, Willie Lee Hunt, because of Hunt's involvement in the Church of God, a religion the prosecutor knew nothing about. Hunt was the only veniremember who indicated a preference for this particular denomination. Marked on Hunt's information card was Hunt's failure to respond to whether he had been accused in a criminal case. The prosecutor further testified that he could not specifically remember whether he struck Hunt merely because of Hunt's religious preference, or whether the omitted portion of the information form also was a consideration.

---

**1.** The majority fails to analyze the totality of the reasons that went into the decision to strike particular jurors. Where a prosecutor articulates more than one reason for exercising a strike, the rationale must be viewed looking at the combination of reasons, for any individual reason alone may not have motivated a decision to strike. Regarding veniremember Ramsey, the majority fails to address the prosecutor's combined concerns. Ramsey was both youthful and, in the prosecutor's opinion, was married to a man in a liberal profession. This combined reason makes veniremember Ramsey qualitatively different from other panel members who may have been *only* youthful *or* who *may* have been married to individuals in a liberal profession. For the majority's treatment of Ramsey's age, *see infra* note 3.

This evidence supports the trial court's finding of no purposeful discrimination.

Lastly, the state exercised a peremptory challenge on veniremember No. 39, Reginald Ardoin. The prosecutor testified that he was concerned that Ardoin was only twenty-one years of age, and that Ardoin's spelling on the information form was very poor. Specifically, Ardoin misspelled Riverside General as "Riveside Genral" and misspelled his religious preference of Baptist as "Bapaitsm." The record reflects that Ardoin was the only veniremember under the age of twenty-four.[2] Viewing the evidence in the light most favorable to the trial court's findings, the record supports the trial judge's determination of no purposeful discrimination.

For the foregoing reasons, I would affirm the judgment of the court below.

McCORMICK, P.J., and WHITE, J., join this opinion.

## OPINION ON STATE'S MOTION FOR REHEARING

MILLER, Judge.

On original submission, in addressing appellant's *Batson*[1] claim, we held the trial judge's findings concerning the prosecutor's explanations for his peremptory challenges were not supported by the record, and appellant established purposeful discrimination in the prosecutor's jury selection process. Page 742. Consequently, we reversed the judgments of the court of appeals and the trial court and remanded this cause for a new trial. The State then filed this motion for rehearing. Tex.R. App.Proc. 230.

In its motion for rehearing, the State argues this Court applied the incorrect standard of review in this *Batson* case. The State urges us, in its motion, to adhere to the standard enunciated in *Tompkins v. State*, 774 S.W.2d 195 (Tex.Cr.App.1987), cert. granted 486 U.S. 1053, 108 S.Ct. 2818, 100 L.Ed.2d 919 (1988), judgment affirmed by equally divided court (O'Connor, J., not participating), 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834, that the appellate court must view the entire record in a manner favorable to the factfinder's determination and reverse only if no rational trier of fact could have failed to find his factual allegation true by a preponderance of the evidence.[2] *Tompkins*, 774 S.W.2d at 202. In its post submission brief, however, the State suggests three other standards of review which may be utilized in addressing a *Batson* claim, to wit: (1) the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard for reviewing sufficiency of the evidence, (2) the abuse of discretion standard utilized in reviewing

---

**2.** The majority claims that "the state struck two blacks from the venire because they were close in age to appellant but did not strike any of the six white venirepersons who were also close in age to appellant." At 715. In so doing, the majority ignores the prosecutor's additional reasons for striking the two, young black veniremembers. As previously detailed, the prosecutor was concerned with veniremember Ramsey's age *and* her husband's profession. Veniremember Ardoin was a few years younger than any other veniremember, in addition to his inability to spell. It should also be noted that the prosecutor circled the ages on the information forms of some of the youthful white veniremembers, but did not do so on other young white veniremembers. There is evidence in the record to demonstrate that the youth of both black and white veniremembers played *some* part in the prosecutor's use of peremptory strikes.

**1.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**2.** The State prays for one of two things in its motion: *viz,* this Court grant the State's motion for rehearing and affirm the conviction, or grant the State's motion and remand this cause to the trial court with instructions to make specific findings and conclusions regarding the credibility of the prosecutor's racially neutral explanations for the use of his peremptory challenges. The State generally asks this Court to re-examine the role of the appellate court when reviewing a *Batson* claim and to consider the impact of our original opinion on the peremptory challenge system and the appellate court system, specifically this Court's docket. The State asserts we have created an improper standard of review. Yet, in its motion for rehearing and during oral argument before this Court, the State also took the untenable position that a trial court's findings of fact should not be subject to appellate review.

rulings on pretrial suppression motions, and (3) the "clearly erroneous" standard of review found in Fed.R.Civ.Proc. 52(a).[3] In his response to the State's motion, appellant asserts this Court's analysis is consistent with that of *Batson* and *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), which appropriately employed the federal "clearly erroneous" standard in reviewing the district court's finding of sex discrimination in a Title VII case.[4]

In this cause, on original submission, this Court utilized and applied the standard of review enunciated by a unanimous court in *Keeton v. State*, 749 S.W.2d 861 (Tex.Cr. App.1988) (Opinion after Abatement). In *Keeton*, we stated:

> In adopting our own standard for review, we reject Alabama's 'clearly erroneous' standard, which is the federal standard for reviewing findings of fact. See Rule 52(a), Federal Rules of Civil Procedure. Nor do we adopt Indiana's abuse of discretion standard. We believe that our focus, as well as that of the trial judge, should be on whether purposeful discrimination was established. We will of course consider the evidence in the light most favorable to the trial judge's rulings and determine if those rulings are supported by the record. If the record supports the findings of the trial judge, they will not be disturbed on appeal.

*Id.* at 870. In applying this standard of review to the record before us, this Court concluded the trial judge's findings and conclusions were not supported by the record. While this Court explicitly rejected, without further elaboration, the nomenclature of "clearly erroneous" in *Keeton*, in this case we nevertheless adhered to the analytical processes of that standard of review, the core of which is the "supported by the record" analysis, as discussed *infra*. On original submission here we recognized that a finding of purposeful discrimination is a fact finding which entitles the trial judge's findings to be accorded great deference by an appellate court. Further, in determining whether the trial court erred in overruling appellant's *Batson* claim, we reviewed the evidence from the *Batson* hearing within the context of the case, in light of the entire record, and most importantly in the light most favorable to the trial judge's findings. Believing this analysis is synonymous with the "clearly erroneous" standard's analysis, we are not necessarily indisposed to granting the State's motion for rehearing to the extent that we adopt the "clearly erroneous" standard from the Federal Rules of Civil Procedure as the standard of review for appellate courts in addressing *Batson* issues.

Although certainly not the first case to apply the clearly erroneous standard, *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 clearly explicated this standard of review, from which we quote extensively:

> Although the meaning of the phrase 'clearly erroneous' is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles, as the Fourth Circuit itself recognized, is that **"[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."** *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)

3. This rule provides in pertinent part:
   Effect. ... Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses
   ...

4. In footnote 21 in *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724, the Supreme Court cited *Anderson v. Bessemer City* for the principle that "a finding of intentional discrimination is a finding of fact entitled to appropriate deference by a reviewing court." Likening that finding in a Title VII case to the issue in *Batson*, the Supreme Court noted the trial judge's findings in this context (purposeful racial discrimination) turned largely on a credibility evaluation and should be deferentially accorded.

[emphasis supplied]. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*' *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 842, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); see also *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

*Anderson v. Bessemer City*, 470 U.S. at 573–574, 105 S.Ct. at 1511. See also *Amadeo v. Zant*, 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). (clearly erroneous standard applied to district court's fact findings in habeas corpus action). Recognizing that findings of fact often turn on credibility determinations, the Supreme Court further discussed the clearly erroneous standard, stating:

When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. See *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). **This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness.** Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. See, *e.g. United States v. United States Gypsum Co., supra*, 333 U.S., at 396, 68 S.Ct., at 542. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. [emphasis supplied]. Cf. *United States v. Aluminum Co. of America*, 148 F.2d 416, 433 (CA2 1945); *Orvis v. Higgins, supra*, [180 F.2d 537, 539–540 (CA2 1950) ].

*Anderson v. Bessemer City*, 470 U.S. at 575–576, 105 S.Ct. at 1512.

There are several reasons in favor of adopting the clearly erroneous standard, foremost of which is the similarity in analysis in that standard with our own analysis under the "supported by the record" standard. The phrase "supported by the record" is found in conjunction with the clearly erroneous standard in a substantial number of federal cases. Indeed, a "supported by the record" *analysis* is utilized in determining whether the trial court committed clear error in its fact findings in these cases. See e.g. *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 568, 98 L.Ed.2d 592 (1988) (fact findings amply supported by the record, and not rejected by the court of appeals as clearly erroneous); *H.A. Artists & Associates, Inc. v. Actor's Equity Association*, 451 U.S. 704, 717, 101 S.Ct. 2102, 2110, 68 L.Ed.2d 558 (1981) (court of appeals cor-

rectly concludes trial court finding not clearly erroneous because amply supported by the record); *City of Richmond, Virginia v. United States*, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975) (dissenting opinion) (district court's finding, far from being clearly erroneous, was amply supported by the record); *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 612, 70 S.Ct. 854, 858, 94 L.Ed. 1097 (1950) (trial judge's findings adequately supported by the record are not clearly erroneous); and *Branti v. Finkel*, 445 U.S. 507, 511, 100 S.Ct. 1287, 1291, 63 L.Ed.2d 574 (1980) (footnote 6) (since court of appeals found district court's fact findings adequately supported by the record, Supreme Court will not review findings petitioner claims were clearly erroneous). See also *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (finding is "clearly erroneous" when although *there is evidence to support it,* reviewing court on the entire evidence is left with definite and firm conviction a mistake has been committed). In *Amadeo v. Zant*, 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988) the issue confronting the Supreme Court was whether the court of appeals had erred in determining the district court's findings upon which it based its conclusion that petitioner had shown cause for procedural default at trial were clearly erroneous. The Supreme Court reiterated the clearly erroneous stan-

dard of review relying predominantly on the explication of that standard in *Anderson v. Bessemer City* in addressing the issue. In reversing the court of appeals' holding, the Supreme Court concluded there was "sufficient evidence in the record considered in its entirety to support the District Court's factual findings", and therefore the court of appeals erred in setting them aside. *Amadeo v. Zant*, 108 S.Ct. at 1780. In other words, if the findings of the trial judge are supported by the record, the findings are not then clearly erroneous.

After adopting "our own standard of review" of "supported by the record" in *Keeton*, 749 S.W.2d 861, we applied the standard to facts of that case. In doing so, we reviewed the entire record[5]; *viz,* the voir dire examinations of the prospective jurors who were peremptorily challenged as well as the evidence presented at the *Batson* hearing which consisted only of the prosecutor's testimony as to why he peremptorily struck each venireperson. The defense counsel did not cross-examine the prosecutor or attempt to impeach the prosecutor through other evidence such as a comparison analysis of the peremptorily challenged white and black venirepersons. See *Keeton*, 749 S.W.2d at 879 (Teague, J., concurring). Given this record, we held the trial judge's findings were supported by the record.[6] In adopting the clearly erroneous standard, we would be merely extending

---

**5.** See footnote 1 in *Keeton*, 749 S.W.2d at 863.

**6.** We also employ the "supported by the record" standard when reviewing the findings of a trial judge in a habeas corpus proceeding. It is well-settled that this Court is not bound by the trial judge's findings or conclusions but rather is obligated to determine if the record developed supports the trial judge's findings. *Ex parte Adams,* 768 S.W.2d 281 (Tex.Cr.App.1989). "If the record will not support the trial judge's conclusions, then this Court may make contrary findings. (citations omitted) If, on the other hand, the findings of the trial judge are supported by the record, they should, at the very least, be considered by this Court." *Id.* at 288. In his concurring opinion in *Ex parte Brandley,* 781 S.W.2d 886 (Tex.Cr.App.1989), Judge Duncan, who wrote the majority in *Ex parte Adams,* gave meaning to this principle of law:

We must take the record as we find it. Accordingly, we cannot add facts, assume facts,

disregard facts, or accord certain facts greater or lesser significance. That is simply not our function. There is no question that the abundance of material presented with this case makes our task extremely difficult. That is why the trial judge is accorded the deference to make findings of fact. All that we should do is determine whether they are supported by the record. That is all. I have read every page of the writ hearing and although I may not have made the same findings of fact or conclusions of law as [the trial judge], I do find that they are supported by the record. Consequently, unless we are willing to overrule all of the cases to the contrary or conjure up a way to deceptively distinguish them we actually have no choice but to accept the findings and conclusions that have support in the record.

*Ex parte Brandley,* 781 S.W.2d at 895 (concurring opinion).

the "supported by the record" standard to its ultimate and logical conclusion.

Additionally, the clearly erroneous standard enjoys an extensive history of use and hence provides the bench and bar with a well-established analysis for guidance when confronted with issues encompassing disputed factual findings.[7] Since it is the standard of review for factual findings in all federal cases, the clearly erroneous analysis has of course been applied in discrimination suits, in particular Title VII cases, which we noted were referred to in the *Batson* decision. Moreover, given this extensive use of the clearly erroneous standard, the analysis done by appellate courts is apt to be more consistent. Rather than developing our own standard of review on a case-by-case, ad hoc basis, which could be construed more or less stringently than the clearly erroneous standard, we have clear precedent on the principles of the standard of review and their application.

Factual findings made pursuant to a *Batson* claim have been reviewed by the Fifth Circuit via the clearly erroneous standard. In *United States v. Forbes*, 816 F.2d 1006 (5th Cir.1987), the court of appeals held the district court did not clearly err in finding the prosecutor exercised his peremptory challenges in a nondiscriminatory manner. In *Forbes*, there were thirty-one veniremembers, five of whom were black. The prosecutor used three peremptory challenges to strike black veniremembers, two to strike white veniremembers, and his

sixth peremptory challenge went unused. The resulting jury was composed of ten whites and two blacks, and the ratio of blacks to whites on the jury was "virtually identical to that on the venire". *Id.* at 1009. The prosecutor offered neutral explanations for two of the three peremptory challenges to black venirepersons, and the appellant admitted one such explanation was objective. After reviewing the second explanation, the court of appeals held the record did not "remotely suggest that the prosecutor's intuitive assumption was based on race."[8] The appellate court thus found no Fifth or Sixth Amendment violation. *Id.* at 1013.

No clear error in the district court's finding of no discrimination in the jury selection was also the conclusion of the court of appeals in *United States v. Williams*, 822 F.2d 512 (5th Cir.1987), following Rule 52(a) and the *Forbes* decision. In this case, the government used four peremptory challenges to strike blacks, of which there were seven, from the venire. Once again the Fifth Circuit found a confluence of factors supported the district court's finding, those factors being: (1) the black/white ratio of the jury exceeded that of the venire; (2) the prosecutor did not use all of his strikes; (3) three blacks were on the jury; (4) the prosecutor adequately explained three strikes; and (5) most of the government's witnesses were black.[9]

■ In *United States v. Lance*, 853 F.2d 1177 (5th Cir.1988)[10], the court of appeals

7. See *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 542, 92 L.Ed. 746, a 1948 case, which notes that before the Rules of Civil Procedure were promulgated the practice in equity was "that the findings of the trial court, when dependent upon oral testimony where the candor and credibility of the witnesses would best be judged, had great weight with the appellate court [but] [t]he findings were never conclusive".

8. The reason for the prosecutor's third strike' was left unexplained and such was not objected to by the appellant. The court of appeals, in footnote 7, however, concluded it was unlikely the third strike resulted from intentional discrimination based on the facts of the jury selection. The court of appeals found the following facts to be significant, "perhaps determinative[ly] significan[t]": (1) the black/white ratio

on the jury mirrored that of the venire; (2) the prosecutor adequately explained two strikes; (3) the prosecutor did not use all his strikes; and (4) there were two blacks left on the jury. 816 F.2d at 1011.

9. The appellant in *Williams* also complained that three black jurors were deleted from the original venire list without explanation. Appellant failed to preserve this issue for review, but the court of appeals reiterated that a finding of intentional discrimination was unlikely in light of the fact the prosecutor accepted a jury comprised of 25% blacks, a figure higher than that of the venire, and did not use all of his strikes. 822 F.2d at 516.

10. This case involved three defendants who were tried jointly and appealed jointly. Only one of the defendants was black, and it is he who raised the *Batson* issue in this appeal.

was finally presented with rebuttal or impeaching evidence from a defendant in response to the government's neutral explanations for its peremptory challenges. Finding the issue boiled down to a credibility choice, the court of appeals accepted the findings of the trial judge that the prosecutor's reason for striking two black veniremembers was not a pretext for racial discrimination.[11] The venire contained thirty-six people, five of whom were black. The prosecutor peremptorily challenged two black and four white persons, but he did not use his one peremptory challenge in selecting alternate jurors. The resulting jury panel included two black jurors, and one of the two alternate jurors was black.

The trial judge in Lance addressed the jury selection issue twice. After voir dire, the prosecutor stated he challenged the two black prospective jurors because they were "young, single, and without children or a 'substantial stake in the community' and that each appeared inattentive to him during voir dire examination." Defendant's counsel commented that one excluded person was actually a life-long resident of the community, and he disputed the prosecutor's observations regarding attentiveness. The prosecutor responded he "had enough challenges" to exclude all blacks if he intended that result. After the jury retired to deliberate, the trial judge again broached the subject of discrimination in the jury selection. Based on the above facts, the trial judge found the prosecutor selected "jurors who were older and meaningfully employed and who had children or family responsibilities." According

to the court of appeals, the judge did not alter his conclusion when appellant's counsel noted one white juror was "young, single, and only a three-year resident of the county." Because the prosecutor partially based his neutral explanations on nonquantifiable characteristics and the trial judge personally observed the proceedings, the court of appeals deferred to the trial judge's findings in this case.[12]

Applying the specific holdings from the Lance case and giving appropriate deference to the trial judge's findings, the Fifth Circuit again upheld a district court's finding of no purposeful discrimination in United States v. Terrazas–Carrasco, 861 F.2d 93 (5th Cir.1988). In this case the prosecutor gave reasons [13], which the Fifth Circuit deemed "credible", for his peremptory challenges similar to those articulated in Lance, viz: age, eye contact, and body language. There was no mention of any challenge that the prosecutor did not strike whites of similar age or body language or did not question the prospective jurors. The court found compelling the facts surrounding the jury's selection, specifically noting that even though six of the seven peremptory challenges exercised by the prosecutor were used to strike minorities from the venire several others remained in the venire. "Had the prosecutor used all of his challenges to exclude members of defendant's race, his [Batson] argument might be stronger." Terrazas–Carrasco, 861 F.2d at 95. On this basis the court concluded the failure of the trial judge to rule in the defendant's favor was not clearly erroneous.

11. The court of appeals stated "[w]e must accept the judge's credibility choice and affirm his finding on these facts." 853 F.2d at 1181. (emphasis added) In discussing the deference due a trial judge's findings on appellate review, however, the Supreme Court stated "[t]his is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations". Anderson v. Bessemer City, 470 U.S. at 575, 105 S.Ct. at 1512. Thus, even though a finding of fact may be based on a credibility choice, it clearly remains subject to appellate review, and the appellate court is not required to accept the finding.

12. Without expressly holding the trial judge's findings of fact were not clearly erroneous, the

court of appeals implicitly made that determination. In pertinent part, the court of appeals stated:

> ... we have observed that the Supreme Court suggested in Batson, again by reference to a Title VII case, that the district court's ultimate finding should be reviewed under "either a 'clearly erroneous' or 'great deference' standard." [citations omitted] This case illustrates the wisdom of deferential review.

853 F.2d at 1181.

13. The court of appeals' analysis on this issue is rather cursory, and the specific reasons are not enumerated in the opinion.

This review of federal case law interpreting and applying the clearly erroneous standard is not only instructive to this Court but also upholds and reinforces the conclusion of the majority in this cause on original submission. This case law review teaches that the "supported by the record" standard adopted in *Keeton*, 749 S.W.2d 861, is actually an analytical tool used in determining whether a trial judge's findings of fact are clearly erroneous or should be accorded great deference. While the nomenclature is different, the analysis is essentially the same under each of the three "standards of review"—clearly erroneous, great deference, supported by the record—and, in fact, the clearly erroneous and great deference standards engage in the same level of review.[14] Indeed, the Fifth Circuit has used the clearly erroneous and great deference standards interchangeably when reviewing the district court's findings. See *e.g. Terrazas–Carrasco*, 861 F.2d at 94; *Lance*, 853 F.2d at 1181; *Williams*, 822 F.2d at 515; and *Forbes*, 816 F.2d at 1010.

Under the foregoing analysis, we hereby adopt the "clearly erroneous" standard as the standard of review for appellate courts in addressing *Batson* issues. Our decision in *Keeton*, 749 S.W.2d at 870, is so modified.

Returning to the merits, on original submission we determined the trial judge's findings were not supported by the record; ergo, the findings were clearly erroneous. In arriving at this conclusion, we analyzed the evidence in this case in the same manner as the Fifth Circuit, *viz:* reviewing the record in its entirety by considering the voir dire process including the racial constitution of the venire, the prosecutor's neutral explanations, and appellant's rebuttal and impeaching evidence.

To briefly recapitulate the pertinent facts: there were seven blacks seated in the first forty venirepersons of the panel; one black venireperson was struck for cause and the remaining six black venirepersons were peremptorily challenged by the State. Thus, the State used six of its ten peremptory challenges to remove all remaining blacks from the jury panel, and appellant, a black male, was tried by an all-white jury. At the *Batson* hearing, the prosecutor presented his neutral explanations for striking the six black venirepersons. His reasons predominantly included age, religious preference, and occupation.[15] Appellant's attorney then presented extrinsic evidence in rebuttal of the prosecutor's neutral explanations for his peremptory strikes. On his juror information sheets, the prosecutor indicated the race of each black venireperson by marking the letter "B" next to his or her name. After the prosecutor explained he peremptorily struck two black venirepersons because of their closeness in age to appellant, appellant's attorney noted there were six white venirepersons with this same characteristic who were not peremptorily challenged by the State. Additionally, of the ten venirepersons who had friends or relatives connected with law enforcement agencies, only two were peremptorily challenged by the State and both these venirepersons were black.[16] Moreover, the prosecutor testified he struck two black venirepersons who he believed were "liberal" even though he did not ask any questions of either prospective juror during voir dire. One prospective juror's husband was a nurse's assistant. The prosecutor also struck black venirepersons on the basis of their religious preference, although he did not mark or empha-

---

**14.** We term "supported by the record" a standard of review only since we adopted it as our standard in *Keeton*. Within the federal appellate system there is not a separate standard of review known as "supported by the record", but rather only the clearly erroneous and great deference standards which we have noted are actually the same standard, both utilizing an analysis which determines whether there is support in the record for the trial judge's findings.

**15.** In his sixth finding of fact, the trial judge stated the prosecutor used ethnic, religious, and job-related stereotypes as the bases for his neutral explanations.

**16.** The prosecutor stated he struck one of these prospective jurors because of her religious preference, and he struck the other black woman because of her demeanor and the intonation in her voice when she answered a question from appellant's attorney during voir dire.

size on the juror information sheets the religion of the black venirepersons as he did with the white venireman who he peremptorily challenged because he was Jewish. This comparison analysis of the use, or lack thereof, of the peremptory challenges against the black and white prospective jurors indicates the State's disparate treatment [17] of them and that the State relied on group biases where the group trait was not shown to specifically apply to the challenged jurors.

While this evidence was more fully discussed in our original opinion, the dissent [18] raises two factual matters that were not. The first concerns the prosecutor's explanation that he marked the juror information sheets of the black members of the panel not for the purpose of striking them because of their race, but rather as "landmarks" in the sea of faces on the panel so that he could readily locate non-blacks in the sea by reference to his juror list. The trial court made no finding of fact concerning the reason for the six "B" marks, but an analysis of the prosecutor's description, quoted in the dissent, of the seating of the panel with Ms. Fuller on row 3 as number 24, puts 2 "landmarks" side by side in row 1, none in row 2, 1 on row 3, 3 on row 4 and none on row 5. While it is theoretically *possible* that a "landmark" system was the prosecutor's only goal, this "system" is such a disjointed, unwieldy, and inefficient one that this explanation is hardly *plausible*. We are reminded again of the words of Justice Marshall in *Batson*, quoted in our original opinion and in Judge Teague's

concurring opinion in *Keeton v. State*, 749 S.W.2d 861 (Tex.Cr.App.1988), at 874–875.

■■■ The second matter raised by the dissent deals with the combination of reasons given for striking several blacks, and the failure to consider the combination in the comparative analysis on original submission. For instance: Number 24, Mayrine Fuller, was struck because she was a teacher *and* did not fill in one blank on her information form. But another minority, a Mexican–American woman, was struck because she was a teacher. Number 8, Sherry Ramsey, was struck because her husband was a nurse *and* she was close to appellant's age. But a white venireman, Virgil Thompson, was struck in part because of his occupation (hairstylist). Again, a more detailed analysis of the facts is contained in our original opinion (see also dissenting opinion by Judge Berchelmann). Certainly the cumulative force of several reasons, each individually racially disparate, may suffice to overcome a prima facie case of discrimination where a single one would not. This case is simply not one of those situations. In order to sustain the trial court's findings we must find that as to *each* minority venireman struck his decision was not clearly erroneous, for the use of one purely racially motivated strike is prohibited by *Batson*. *Henry v. State*, 729 S.W.2d 732 (Tex.Cr.App.1987). Here, in the face of a total lack of questioning by the prosecutor to determine if alleged group biases pertain to the individual minority jurors, the implausibly explained objective evidence of race notation by the

**17.** See *Keeton,* 749 S.W.2d at 868, quoting *Ex parte Branch,* 526 So.2d 609 (Ala.1987), for an illustrative list of the types of evidence which can be used to show sham or pretext in the prosecutor's explanations. Disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck—is one such type of evidence.

**18.** As can be seen from a comparison of Presiding Judge McCormick's dissent with the majority opinion on rehearing, appropriateness of which text to highlight, like beauty, is often in the eye of the beholder. In quoting *Anderson,* this opinion emphasizes "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed" because the Supreme Court referred to it as representing the foremost principle in understanding the phrase "clearly erroneous". The dissent emphasizes "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the [court of appeals] may not reverse [it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently]." Op. at p. 743. Certainly, where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. As discussed infra, considering the record as a whole, we simply do not see two permissible views on the issue at hand.

prosecutor, the fact that all blacks were struck by the prosecutor and that it took more than half of the prosecutor's strikes to do so, and the disparate treatment by the prosecutor of members of appellant's minority race, as discussed in the original opinion, application of the clearly erroneous standard from the federal rules leaves us "with [a] definite and firm conviction that a mistake has been committed", *United States v. United States Gypsum Co.*, 333 U.S. at 395, 68 S.Ct. at 542, and that appellant has been denied due process in the jury selection procedure utilized by the State in this case.

We hold appellant has shown clear error in the trial judge's findings of fact, and he has established his *Batson* claim as a matter of law.

The facts of this cause, when compared to those of the federal cases, compel this conclusion. In its determination in *Lance, Forbes,* and *Williams,* that the district court did not clearly err in finding against the appellant's *Batson* claim, the Fifth Circuit found significant the fact that the ratio of black jurors to white jurors on the jury was the same (or more favorable to the defendant) as the ratio on the panel. Also significant in all four Fifth Circuit cases is the fact that the prosecutor in each case did not use his peremptory challenges to remove from the venire *all* persons of the same race as the appellant. In the cause *sub judice* the State used its peremptory challenges to remove all blacks from the panel, after the one black veniremember who was challenged for cause was excused. The extrinsic evidence presented in this cause also distinguishes it from the federal cases. No detailed comparison of the characteristics of the challenged minority veniremembers versus the unchallenged white panel members was done in *Terrazas–Carrasco, Forbes,* or *Williams.* In *Lance,* there was a minimal comparison between two blacks peremptorily challenged and one white juror who served. In contradistinction, in the present cause appellant's detailed presentation of evidence

indicating that the black members of the venire were treated differently than the white members sufficiently rebuts the prosecutor's neutral explanations for his peremptory challenges and supports a holding that the trial court clearly erred in finding no purposeful discrimination in the jury selection process in appellant's trial.

The State's motion for rehearing is granted to the extent we adopt the clearly erroneous standard of review.[19] Appellant's ground for review, however, is again sustained. Accordingly, the judgments of the court of appeals and the trial court are reversed, and the cause is remanded to the trial court.

CLINTON, J., *dubitante* and may write when appropriate.

TEAGUE, Judge, concurring.

David F. Breck, in his law article entitled "Peremptory Strikes After Batson v. Kentucky," April, 1988 *ABA Journal,* commented: "The U.S. Supreme Court's decision in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (April 30, 1986), henceforth *Batson,* will forever change *for the better* the jury selection process in criminal and possibly civil trials." (Emphasis supplied.)

*Batson* held, inter alia, that the equal protection clause forbids the prosecutor from exercising his peremptory strikes on potential jurors on account of their race or on the assumption that black jurors as a group will be unable to consider the state's case against a black defendant impartially. Records before this Court, however, indicate that since *Batson* there has been little, if any, change in the jury selection process in criminal cases in the exclusion of members of the same race as the defendant from serving as jurors. In short, the prosecutor's legitimate hunches and past experiences based on age, marital status, handwriting, ability to spell, group association, and like race-neutral stereotyping have been ruled sufficient to pass muster when

---

**19.** The Opinion Dissenting to the Granting of the State's Motion for Rehearing, by Miller, J., is withdrawn.

it comes to exercising a peremptory strike. The prosecutor has simply changed his garb in order to eliminate from the jury panel members of the same race as the accused.

For appellate review purposes, are such race-neutral explanations as the following going to be sufficient to satisfy *Batson?* If so, we might as well file *Batson* in the archives of this Court and go on to better things: (1) the prosecutor thought that the juror had smiled at the defendant; (2) the prosecutor thought that the juror appeared to be inattentive to the prosecutor yet very attentive to the defendant's attorney; (3) the prosecutor thought that the juror did not maintain eye-contact with him; (4) the prosecutor thought that there was no development of back-and-forth relationship or communication during the voir dire examination; the prosecutor felt (had a hunch?) that the juror distrusted him and that "something seemed unfavorable"; (5) the prosecutor thought that the juror did not appear interested in the court proceedings because he kept glancing at the clock on the courtroom wall; and the prosecutor had problems with the juror because the juror "slumped" down in his seat.

Trial judges have accepted these type reasons and appellate courts have put their stamp of approval on them, in this and other States.

The difficulty, of course, from an appellate court standpoint, in accepting these balderdash reasons lies in the fact that the trial judge is vested with the responsibility of determining the totality of the circumstances—ranging from the verbal explanation of the venireperson to the venireperson's unspoken interaction with the prosecutor during the voir dire examination—whether an articulated race-neutral explanation, such as those above, is but an excuse or pretext for improper discrimination through the use of a peremptory strike by the prosecutor, and his decision is often final in making such decisions.

Where the defense attorney is unprepared for a "Batson" hearing, in that he asks the prosecutor no questions and does not present any impeaching or rebuttal evidence, then the answer to resolving the question, as occurred in *Keeton v. State,* 749 S.W.2d 861 (Tex.Cr.App.1988), *Tompkins v. State,* 774 S.W.2d 195 (Tex.Cr.App. 1987), and even this cause, is usually an easy one for the trial judge to make.

Is the solution perhaps to seal off the jury panel, in order to prevent the prosecutor, the trial judge, and the defense attorney from seeing the race of the members of the jury panel? See and compare *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). At least that way, an appellate court would not be going through a bunch of hocus pocus or attempting to use non logical reasons to make the determination whether the prosecutor has given a legitimate race-neutral explanation why he exercised a peremptory strike on a minority member of the panel. At least that would eliminate from the scene highly suspicious and questionable explanations that prosecutors are so fond of giving, and appellate courts are so quick to approve. E.g., *Tompkins,* supra.

The cause at Bar is one of those cases decided prior to when *Batson* was decided by the United States Supreme Court. That, however, is no excuse for the condition of the record being in the state it is at this time because there have actually been two "Batson" hearings in this cause. Trial counsel for appellant was simply not prepared for a "Batson" hearing, understandably because when both hearings were held *Batson* had not yet been decided. He simply did the best that he knew how to do under the circumstances.

However, because it was pending on appeal when *Batson* was decided, Larry Williams Whitsey, henceforth appellant, is entitled to the benefits of that decision. Also see *Griffith v. Kentucky* and *Brown v. United States,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), and *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986).

Prior to *Batson,* the rule of law in Texas was quite simple: The mere use by the prosecutor of his peremptory challenges to strike qualified minority persons from the jury was not per se prohibited, and prose-

cutors were free to strike such persons almost at will. See, for example, *Evans v. State*, 622 S.W.2d 866 (Tex.Cr.App.1981); *Chambers v. State*, 568 S.W.2d 313 (Tex. Cr.App.1978, and cases cited therein at 328; *McKay v. State*, 707 S.W.2d 23, 39 (Tex.Cr. App.1985); *Jason v. State*, 589 S.W.2d 447 (Tex.Cr.App.1979); *Ridley v. State*, 475 S.W.2d 769 (Tex.Cr.App.1972)). My research to date has not yet revealed a single case where *this* Court reversed because of the race-neutral explanations given by the prosecutor.

Also prior to *Batson*, the accused, "to pose the issue, had to show the prosecutor's *systematic use of peremptory challenges against Negroes over a period of time.*" (Emphasis supplied.) *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), henceforth *Swain*, 85 S.Ct. at 839. In fact, the Supreme Court engrafted a "presumption" rule that the prosecuting attorney did not exercise his peremptory strikes on account of race or on the false assumption that members of the defendant's race as a group were not qualified to serve as jurors in such a case. In sum, for the accused to establish a prima facie case of purposeful discrimination by the prosecuting attorney under *Swain v. Alabama*, it was necessary for him to establish the repeated striking of blacks over a number of cases by the same prosecuting attorney. This largely made prosecuting attorneys use of peremptory strikes immune from constitutional scrutiny. However, *Swain* was not without its critics or its criticisms. See footnote 2, *Tompkins v. State*, 774 S.W.2d 195, 199, fn. 2 (Tex.Cr. App.1987).

Occasionally, however, an accused in a State court would receive relief under *Swain*, but under state constitutional law and not federal law. Shaw, in his law review article entitled "Batson v. Kentucky: The Court's Response to the Problem of Discriminatory Use of Peremptory Challenges," 36 *Case Western Reserve Law Review*, at page 585, pointed out that in 1986, a trial judge found that the accused individual made out a prima facie case that the prosecuting attorney had exercised his peremptory strikes against members on the venire panel of the same race as the accused, in a systematic manner, and the prosecutor was unable to come forward and demonstrate a non-race related explanation why he exercised a peremptory strike on a member of the same race as the accused, and granted the accused relief. See *State v. Washington*, 375 So.2d 1162, 1164 (La.1979); *State v. Brown*, 371 So.2d 751 (La.1979). Compare *Doepel v. United States*, 434 A.2d 449 (D.C.1981).

Shaw also pointed out in his article that several jurisdictions had stripped the "systematic discrimination" from *Swain's* requirements, but did so on the basis of those State's constitutional provisions. For example, in *People v. Wheeler*, 22 Cal.3d 258, 583 P.2d 748, 148 Cal.Rptr. 890 (1978), the California Supreme Court ruled that (1) there was a presumption of proper use of peremptory challenges; (2) this presumption was rebuttable upon a showing of (a) several of the challenged jurors belong to a discrete group, and (b) there is a likelihood of their being challenged for no other reason than their group membership. If the above was established, then the burden shifted to the other party to show that the reason for the peremptory challenge related to individual qualities of the challenged jurors and not to group association. Should the trial judge find improper use of a peremptory challenge, the judge must dismiss the jurors, quash the panel, and begin again with a new panel. The court made it mandatory that the proper use of the peremptory challenge was to remove from the panel a perceived juror bias which was specific to the case being tried. See and compare Art. 35.261, V.A.C.C.P.

*Batson* is an equal protection cause, however, and not a fair cross-section case, although a cross section claim was urged in *Batson*. Cf. *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

In this cause, in an attempt to impeach the prosecuting attorney, appellant had other attorneys, who had tried cases against the prosecutor, verify through their testimony that the prosecutor struck

all of the blacks that were on his panels. The following are examples of what kinds of blacks he struck. One of the blacks struck, Beulah Sheppard, had not only been a long time county employee, but had actually served on several Harris County Grand Juries, and was extremely active in Harris County Democratic politics. Another black that had been struck had an uncle who was an assistant district attorney of Harris County. Hearsay provided that the prosecutor would always strike blacks, and this accounted for the fact that the defense attorneys would not exercise any strikes on blacks—because they knew the prosecutor was going to strike all of the blacks on the panel in any event, where the State's complainant was white, which he did except for one black who was excused pursuant to a State's challenge for cause. Of course, because this cause was a pre-*Batson* case, the attorneys' reasons that were given were for naught.

At the new "Batson" hearing, the prosecuting attorney testified that he struck two black prospective jurors and two white prospective jurors because they were teachers and because of their religious preferences (Pentecostal and Church of God). He also testified that he struck another black prospective juror for not answering all of the questions contained on the jury information card. He testified that he also struck one black because "she engaged in dialogue with the defense attorney, nodded with the statements of the defense attorneys, and appeared to have a problem with the .credibility of police officers in general"; he struck another black because of her age (24) and because her husband was employed as a nurse's assistant. He struck another black because of his age (21) and because he could not spell his religious preference (Baptist), nor was he able to correctly spell his place of birth. The prosecuting attorney also perceived that these individuals had liberal philosophies. No reasons were given that might have connected these reasons to appellant's case.

It appears to me that in disposing of a "Batson" issue on appeal, this Court has failed to stress and emphasize what, if anything, might relate to the issue that oc- curred during the actual voir dire examination. In other words, we should first look at the actual voir dire to see if any guiding lights might be present that would later cause a "Batson" hearing to flesh out both race-neutral as well as non-race-neutral reasons. Otherwise, if all that exists in the record on appeal is some sort of post or belated *Batson* hearing, what an appellate court will usually view is only a record that reflects only speculation, surmise, or theory about why the prosecuting attorney struck a minority prospective juror. And there lies the problem with this Court's illusory opinion of *Keeton v. State*, 749 S.W.2d 861 (Tex.Cr.App.1988).

In that case, after the prosecutor exercised his peremptory strike on a minority venireperson, he gave a race-neutral reason. Thereafter, at the "Batson" hearing, he in essence repeated the same reason. Although defense counsel objected, he, the defense attorney, did not cross-examine or impeach the prosecutor; the prosecutor's testimony stood unrebutted and uncontroverted. Thus, the trial judge was left with undisputed and uncontroverted testimony by the prosecutor. The defense attorney was clearly not prepared for a "Batson" hearing.

The record before us reflects that the jury panel consisted of 50 individuals. Seven blacks, who were of the same race as appellant, were in the first 50 members of the panel. One was struck for cause. The State used 6 of its 10 peremptory strikes on the other six blacks, as well as using its other 4 peremptories on non-minority prospective jurors, for various and sundry reasons. Thus, all of the minority members of the panel were eligible to become jurors.

The "Batson" hearing that occurred in this cause also occurred prior to *Batson* being handed down on April 30, 1986. Although it should now be obvious that when a prosecuting attorney is confronted with a venire member of the same race as the accused, he is immediately put on notice that he might have to later explain why, if he did, he used a peremptory strike on that individual. Furthermore, it would appear, in an effort not to embarrass a minority

juror, any discussions that might relate to race should occur outside the presence of the other jurors. The fact that this was a pre-*Batson* case might explain why, when the trial judge limited the voir dire to a total of 40 minutes to each side for their respective voir dire examination, the prosecuting attorney should have sought more time. The record reflects that the prosecuting attorney spent a great deal of his voir dire time generally, and not specifically. In fact, the record reflects that he only individually questioned eleven prospective jurors. However, it is anticipated in the future, when "Batson" is injected into the case, the usual 30 minute voir dire examination to the side will become a prehistoric relic of our jurisprudence.

The only time race was injected into this case was when a white individual disqualified himself from serving because he would not be in a position to punish the defendant for what some other blacks had done to him several years previously. Another juror, a minority prospective juror, who appeared to be of Chinese–American descent, stated that he could not be fair because appellant was a member of a minority race like he was, and he would require the State to prove its case beyond all doubt against appellant.

At the conclusion of appellant's counsel's voir dire examination, and after the jury was seated, counsel for appellant then objected "to the jury on the ground that opposing counsel had used his peremptory challenges to exclude blacks from the jury panel and disqualified Mr. Whitsey's right to a fair cross section of the community. All the blacks were struck by the State. There are six blacks on the jury panel that have been struck." The trial judge agreed there were six blacks on the jury panel who were peremptorily struck by the prosecutor, and that these six were in the first 32 members of the 50 person panel. The prosecutor's only response to appellant's counsel's objection was the following: "I [do not] have a policy of routinely striking blacks." Nothing further was developed on the issue, and the trial judge denied appellant's "due process" objection to the jury that was seated. The hearing on appellant's motion for new trial was conducted approximately two months after trial and sentencing, which was still many months before *Batson v. Kentucky* was decided. Appellant reasserted at the hearing his claim that the prosecuting attorney was racially motivated when he used six of his peremptory strikes on minority members of the panel.

One of the court reporters testified that the prosecutor did not question any of the black members of the panel, and that only one of the black members of the panel was actually questioned by appellant's attorney.

The prosecutor gave the following reasons why he struck blacks from his juror panels:

> I look—when I make any strikes of any jurors, I look and—I consider looking at the age, occupation, religion, their place of birth. I look at how they fill out the juror information sheet. I look at how they appear in court. I try to watch them as they come into the courtroom. I—those that do respond, I certainly listen to how they respond to whatever questions. I observe them as they sit in the jury panel. As far as those, that is just general observations. And I take that all into consideration in trying to make a decision.

Of course, these are simply old fashioned reasons why one might use a peremptory strike on a juror, regardless of that individual's race.

The prosecutor in this cause testified at the motion for new trial hearing that of 12 or 13 cases he had tried in this court, only one black individual had ever served as a juror. The prosecutor testified that of 29 cases he had tried only in two of those cases had a black served as a juror.

The court of appeals sustained the reasons the prosecuting attorney gave as being race neutral, and opined that if a prosecuting attorney may not give race neutral reasons that related to occupational, political, economical, and religious areas, "the Supreme Court must make that expansion." In his motion for rehearing, appellant complained that the court of appeals

erred in not requiring the prosecutor to "articulate a neutral explanation that related to the particular case to be tried." This request was denied.

Since *Batson* was decided, this Court, as well as other appellate courts of this State and Nation, where the trial judge has found, either expressly or implicitly, that a prima facie case of racial discrimination had been established, has grappled with what standard of appellate review should be applied to the prosecuting attorney's "race-neutral" explanation, and the issue was contested. These courts have attempted to reach a decision that does not insulate the trial judge's decision behind the facade of "credibility", while at the same time not insulting the integrity of every trial judge in the State of Texas whose decision was to uphold the race-neutral explanation the prosecuting attorney gave to substantiate why he struck a minority venireperson.

In this regard, in *Tompkins v. State*, this Court ruled: "We do not substitute our judgments of witnesses' credibility and evidentiary weight for those of the factfinder [the trial judge], but affirm those judgments whenever the record discloses sufficient evidence in their support." (774 S.W.2d at 202.) In *Tompkins*, notwithstanding that this Court was greatly concerned with the reason that one of the prosecutors gave as to his race-neutral explanation why he struck a minority vernireperson—solely because the venireperson had been an employee of the United States Postal Service for some thirteen years, and because his co-counsel stated that she had had terrible experiences with such individuals as jurors who had served in the past on juries she had selected—this Court sustained the trial judge's decision to accept the prosecutor's race-neutral explanation why he peremptorily struck this venireperson. Notwithstanding this Court's concern, it held that "where the accused has the ultimate burden to prove a factual allegation, such as purposeful discrimination in jury selection, by a preponderance of the evidence, an appellate court must view the entire record in a manner favorable to the factfinder's determination *and reverse only if no rational trier of fact could*

*have failed to find his factual allegation true by a preponderance of the evidence.*" (Emphasis supplied.) 774 S.W.2d at 202.

The Court in *Tompkins*, however, did not discuss the relationship between the race-neutral reason the prosecutor gave and the case about to be tried, nor did it make any sort of comparison type analysis, nor did it delve into the fact that although postal employees in general might make poor jurors for the State, nothing was elicited about the fact that this postman might have made an excellent juror for the State in this case. This is understandable because of the poorly developed record that that this Court had before it to review, much like the one it had in *Keeton*, supra, to review.

It now appears that many prosecutors, and perhaps some trial judges, took our holding in *Tompkins* to mean that when this Court sustains a trial judge's decision to uphold a prosecutor's race-neutral explanation, no matter what the race-neutral reason might be, that it is praising the trial judge's decision, whereas, had this Court overruled the trial judge's decision, we would have been insulting the integrity of not only that very trial judge, but every trial judge in the State of Texas. Nothing could be further from the truth in either instance. We neither affirm nor reverse a trial court's judgment of conviction or sentence on whether that decision would or would not be popular among the trial judiciary of this State, or the citizenry of this State for that matter, and if by chance there is a twinge of criticism from anyone about our decision, we accept it in the spirit of constructive criticism.

When the Supreme Court of the United States granted certiorari in *Tompkins* it was anticipated in many quarters of this Nation, especially by the members of this Court, that that Court would give appellate courts throughout the Nation guidance in reviewing on appeal the trial judge's decision to sustain or overrule a prosecutor's "non-racial peremptory strike" he used on a minority venireperson, i.e., it would clearly flesh out what it had stated and held in *Batson*. However, on June 5, 1989, with

Justice O'Connor disqualifying herself from participation, this Court's judgment was affirmed by an evenly divided Supreme Court. See *Tompkins v. Texas*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989). Thus, under *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the case of *Tompkins v. Texas* exists as though it never left the Court of Criminal Appeals of Texas.

Since *Tompkins* was decided, this Court decided *Whitsey*, which is this case. Because *Tompkins* affirmed the trial court's judgment and *Whitsey* reversed the trial court's judgment, we now must reconcile those cases if we can.

It is thus necessary for us to first review *Tompkins*.

Because *Batson* had been decided while *Tompkins* was pending on direct appeal, and no "Batson" hearing had previously been conducted, it was necessary for this Court on April 22, 1987, to abate the appeal and order the trial judge to conduct a "Batson" type hearing, which is what this Court had previously done in *Henry v. State*, 729 S.W.2d 732 (Tex.Cr.App.1987); *Keeton v. State*, 749 S.W.2d 861 (Tex.Cr.App.1987); *Williams v. State*, 682 S.W.2d 538 (Tex.Cr.App.1985); *Williams v. State*, 731 S.W.2d 563 (Tex.Cr.App.1987), and *De Blanc v. State*, 732 S.W.2d 640 (Tex.Cr.App.1987). To put it quite bluntly, from a defense standpoint, the "Batson" hearing in *Tompkins* actually amounted to the equivalent of no hearing.

A "Batson" hearing was conducted in *Tompkins*, after which the trial judge implicitly found that *Tompkins* established a prima facie case of racial discrimination. The trial judge also implicitly found that the prosecuting attorneys gave race-neutral explanations for exercising their peremptory strikes against five black venirepersons about which excusal the defendant Tompkins had complained.

In sustaining the trial judge's decision to uphold the prosecuting attorneys' reasons for exercising their peremptory strikes against the five black venirepersons about which Tompkins complained, this Court pointed out in its opinion that, to be accept-

able, the prosecutor's race neutral explanation need not be equal to a challenge for cause. Thus, under *Batson* it is only when the defendant makes a prima facie showing that the burden then, and only then, shifts to the State to come forward with a race neutral explanation why it exercised a peremptory strike on a minority of the same race as the defendant. In *Tompkins*, neither party challenged the trial judge's finding that a prima facie case of purposeful racial discrimination was established by the defendant Tompkins.

However, under *Batson*, if the prosecuting attorney comes forward with a race-neutral explanation, the trial court then has the duty to determine if the defendant has established purposeful discrimination, and a reviewing court ordinarily should give those findings, whether favorable or unfavorable, great deference. It is the burden of the accused to persuade the trial judge by a preponderance of the evidence that the allegations of purposeful discrimination are true in fact. The party alleging that he has been the victim of intentional discrimination carries the ultimate burden of persuasion.

In *Tompkins*, this Court ruled that only if no rational trier of fact could have failed to find his (the defendant's) factual allegation true by a preponderance of the evidence, then the prosecutor's testimony alone would not be dispositive of the issue. This is really no different in principle than any other factfinding enterprise. We do not substitute our judgments of witnesses' credibility and evidentiary weight for those of the factfinder, but affirm those judgments whenever the record discloses sufficient evidence in their support.

The problem that an appellate court is confronted with on appeal, in deciding whether the prosecuting attorney has given a logical and reasonable race-neutral reason, rests in the fact that a prosecuting attorney can give a race-neutral reason that represents nothing less than the former use of a peremptory strike, with the prosecuting attorney further stating that he used the peremptory strike for non-racial reasons. Since *Batson*, *this is not*

*good enough anymore.* In other words, since *Batson,* the prosecuting attorney must now bring forth from his closet, and "articulate a neutral explanation related to the particular case to be tried ... [T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges...." *Batson,* 476 U.S. at 98 & n. 20, 106 S.Ct. at 1724 & n. 20, 90 L.Ed.2d at 88–89 & n. 20. Of course, the mere use of peremptory challenges to strike qualified minority persons from the jury is not a prohibited systematic exclusion of those persons in the selection of petit jurors. *Race can still disqualify an individual from serving on a jury.*

However, as Justice Marshall pointed out in the concurring opinion that he filed in *Batson,* "Any prosecutor can easily assert facially neutral reasons and trial courts are ill-equipped to second guess those reasons ... If such easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory." 476 U.S. at 106, 106 S.Ct. at 1728, 90 L.Ed.2d at 94. In *Tompkins,* this Court approved the prosecutor's explanation for using a peremptory strike on a prospective juror solely and only because he was an employee of the United States Postal Service and the prosecutor had "not had very good luck with postal employees." *Tompkins,* at 205. Were we correct in our decision? Did we fail to make clear that the prosecutor failed to articulate a race-neutral explanation related *to the particular case to be tried?* As previously pointed out, in *Tompkins* this Court was dealing with a very poorly developed record, and simply reached the conclusion that a rational appellate court would have, based on the record before us, accepted the prosecutor's race-neutral reason.

A prosecuting attorney who gives or attempts to give race-neutral reasons for exercising a peremptory strike on a member of the same race as the defendant must act race-blind to the venireperson's color. I earlier suggested one method of how

"race" blindness can be achieved during the voir dire process.

After this Court decided *Tompkins,* it then decided *Whitsey v. State,* page 707 (Tex.Cr.App. No. 1121–87, May 10, 1989), which is this cause on State's motion for rehearing. *Whitsey,* like *Tompkins,* is also a very poorly developed record. In *Whitsey,* a majority of this Court concluded that the prosecuting attorneys exercised several of their peremptory strikes based solely on race, thus committing "Batson v. Kentucky" error, thereby depriving appellant due process of law in the jury selection process. The majority opinion on original submission reversed the judgments of the Fourteenth Court of Appeals and the trial court and remanded the cause to the trial court for a new trial. The case is now before us on rehearing.

Almost needless to say, the State was highly displeased with this Court's decision of *Whitsey,* going so far as to exclaim to the world much like Chicken Little did, that the sky was falling, and argued in its motion for rehearing that "the rationale employed by the Court threatens the jurisprudence of this State in a way that will most assuredly trigger a flood of litigation on an issue which this Court is peculiarly ill-equipped to decide. Unless the breech is quickly repaired, this Court will be innundated with hundreds, if not thousands, of cases in which defendants will rightfully petition this Court to decide factual, as well as legal, issues. If this Court should unwisely choose to shoulder this new responsibility, already strained judicial recourses will be overwhelmed and justice will become all the more illusory." (Page 1 of State's First Motion for Rehearing.) I disagree on all counts with the State.

The State, however, intelligently argues that if the prosecuting attorney gives a racially neutral reason why he or she exercised a peremptory strike on a member of the same race as the defendant, "the only issue before the [trial court] is whether the prosecutor truthfully articulated his methodology [and not the soundness of the method used by the prosecutor]. In other words, [the trial court] must determine

whether the reason articulated by the prosecutor is, in fact, his true motivation for exercising the State's peremptory strikes in a manner which excluded blacks, or whether the explanation was a subterfuge to mask his real intent to discriminate on the basis of race." (Page 9, *Id.*)

The State argues on rehearing that once the trial judge has determined that the prosecutor truthfully articulated his methodology for exercising his peremptory strike, i.e., once the prosecutor has made acceptable facially neutral explanations for his strikes, "Appellate courts, therefore, have virtually no role in assessing the propriety or impropriety of a prosecutor's use of peremptory challenges." (Page 10, *Id.*) I disagree. If this were the case, it is likely that no defendant could ever "win" on a "Batson" claim, no matter how pretextual the non-racial reason of the prosecutor might have been. If *Batson* is to be given any meaning, for appellate review purposes, it must not fall within the construction that *Swain v. Alabama* was given by this and other Courts of this Nation.

An appellate court, of course, is bound by the record before it. Sad to say, the "Batson hearing" records that this Court has been privy to are sorely lacking when the issue is whether to rule for the defendant. In short, neither the prosecuting attorneys, the defense attorneys, nor the trial judges appear to know how to prepare for and conduct a "Batson" hearing. Other than when a prosecutor affirmatively admits that he struck a venireperson because of his race, how does an appellate court make the determination that the prosecutor exercised his peremptory challenges to remove from the venire members of the defendant's race?

In the concurring opinion that Justice Dennis of the Supreme Court of Louisiana filed in *State v. Eames*, 365 So.2d 1361 (La.1979), which was long before *Batson* was decided, he essentially concluded that the issue boiled down to whether there was a probability that the prosecutor used his peremptory strikes on minority members solely because they were of the minority race, i.e., whether it was more likely than not that the prosecutor would do such a thing. E.g., *Good v. State*, 723 S.W.2d 734, 740 (Tex.Cr.App.1986) (Teague, J., concurring opinion).

A prosecutor who comes into contact with a member of a minority race should always be race-blind when it comes to deciding whether or not to peremptorily strike that individual. We are all guilty of wrongful first impressions. For example, the juror states he has a record of prior arrests or has complained of police harassment. He may not wear conventional clothing. His hair length may suggest an unconventional lifestyle. He may even wear an earring. The juror ignores the prosecutor, or smiles at defense counsel. Justice Dennis further pointed out that both blacks and whites may have prior arrest records; both may have been victims of crime; both may have relatives in the penitentiary or on the police force; both may believe in strong or weak law and order; and others may alienate a party by bare looks and gestures, and still make good jurors for that case. "It follows that peremptory challenges predicated on such reasons do not significantly skew the population mix of the venire in one direction or another; rather, they promote the impartiality of the jury without destroying its representativeness ... Manifestly if jurors are struck simply because they may hold those beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority." (1371).

Let me use a hypothetical to make my point. The prosecutor gives these reasons as to why he is using a peremptory strike on a member of a minority race. The juror informs the prosecutor that he has four brothers incarcerated in the penitentiary; one of whom is on death row. Presumably, that individual would not facially make a very good State's juror. The juror's family, however, believes that death row and the penitentiary is the best place for their kin. The juror is also philosophically to the right of Atilla the Hun. He has even been the victim of many crimes. He has four other brothers who are police detectives. Unless the latter questions are answered, it

is highly likely that the prosecutor will mistrust the juror serving on the jury and will use a peremptory strike on him; not because of race but because of some non-sensical race-neutral reason, although it is likely he will use a non-race related reason to peremptorily strike the juror. This is usually referred to as "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another."

In other words, we are often guilty of judging one by first appearances or first impressions. Other examples are the juror who is a musician in a jazz or rock band and a free thinker; the juror is a minister; the juror is a member of an unconventional religious group; is unable to completely fill out his juror information card; has negative body posture, crosses his or her arms or legs, is short and terse when the prosecutor questions him; stares at the floor or the ceiling when questioned by the prosecutor; looks like a deadbeat, but in reality is as rich as Howard Hughes was; is disabled; wears a mustache, etc. Without probing into why the prosecutor does not want that individual for this case, are these race-neutral reasons sufficient to satisfy *Batson?*

Unless the prosecutor is acting in a race-blind fashion, these reasons are not only frivolous in order to exercise a peremptory strike for non-racial reasons; they are inadequate, unreasonable, arbitrary, capricious, and discriminatory to serve that function.

However, if the defense attorney does not fill the record with answers to necessary questions, or material impeachment evidence, the appellate court will have no choice but to rule in favor of the trial court.

In this cause, this Court on original submission used what I refer to as a "negative" approach, i.e., because the prosecutor failed to ask many questions of individual venirepersons, "an inference to discriminatory purpose in the prosecutor's use of peremptory challenges is supported by the totality of these facts." (Page 710 of opinion.) However, can the same result not be reached by taking a "positive" approach; i.e., did he not err by asking the minority juror more questions than he asked the white jurors? If the prosecutor cannot recall what he did several years before, and had no notes to refresh his memory, should he be penalized because of this? If the prosecutor spends too much time refreshing his memory, should he be penalized because of this? If the prosecutor marks on his jury information sheet letters such as "B" is he to be penalized? But what if he takes the opposite approach? Is he to be penalized for this as well? It is obvious to me that in the trial judge's findings in this cause he was vouchsafing for the prosecutor's "negative" reasons that he gave. Would the same hold true had he taken a "positive" approach in making his findings?

I find that the adoption of the "clearly erroneous" standard, see *Keeton v. State*, supra, has actually left our trial courts without any standard. It appears to me that the only available standard that can be used for appellate review purposes is whether the trial judge's findings are plainly or manifestly contrary to the great weight or preponderance of the evidence, or something similar to the findings being unreasonable, unsustainable on any reasonable theory or hypothesis, unwarranted as a matter of law, irrefragably impeached, contrary to, or inconsistent with subordinate facts, clearly unjust, or the result of abuse of discretion. In short, when the findings reach the level of either being pretextual or almost pretextual, they amount only to a prejudgment of the case. Some workable standard must be created by this Court. Thus, notwithstanding the trial judge's finding in this cause in favor of the prosecutor's race-neutral reason, I find that for appellate review purposes the one standard set out in *Tompkins* is about as sufficient as one is going to obtain: "[A]n appellate court must view the entire record in a manner favorable to the fact-finder's determination and reverse only if no rational trier of fact could have failed to find his factual allegation true by a preponderance of evidence."

In this instance, the majority opinion finds that "the findings and conclusions of

the trial judge and the holding of the court of appeals are not supported by the record." (Page 713 of opinion.) As far as I can tell, the prosecutor did the best he could with what he had to work with, and the trial judge found that these were sufficient reasons. I believe that more is necessary before the trial judge's findings and conclusions can be rejected. In fact, I find that the "negative" findings for the "positive" findings that the trial judge made in this cause can be converted into "positive" findings. Also see Judge McCormick's dissenting opinion, page 742 of opinion.

However, I agree with the result that the majority opinion reaches solely because I find that no rational appellate court judge can read this record and not conclude that the prosecutor's reasons were a contrived sham or pretext to avoid admitting racial discrimination, and therefore inadequate to rebut the inference of intentional discrimination. In short, the record is in such a state that a rational trier of fact cannot conclude that the prosecuting attorney was "race" blind when he conducted his voir dire examination. The prosecutor simply judged the minority members of the panel on a first impression basis and failed to probe deeply into why he was not using a peremptory strike on the basis of race. Here, the prosecutor failed to offer the required "clear and reasonably specific" explanation for his "legitimate reasons" for exercising his peremptory strikes, in spite of an opportunity to do so. It is anticipated that in the future, when a "Batson" hearing becomes necessary, it can very easily be the lengthiest part of the trial, because if the defense makes a prima facie case, it is going to be necessary for the prosecuting attorney to articulate to death, and not simply say, for example, "The juror was a Democrat or Republican and that is the reason why I struck him or her and I anticipate that the evidence will show that the defendant is a Democrat or Republican." Likewise, a trial judge's findings and conclusions are going to be subject to the most arduous of examination by this Court, and thus the prosecutor's reasons should always be extensively detailed.

For appellate purposes, there is a fine line between a prosecutor's reasons being facially genuine versus the reasons being pretextual or inadequate. Depending on the particular record, the called for answer may be an easy one or it might be a difficult one. Usually, the answer lies in whether the prosecutor has only made generalized assertions of good faith, which are insufficient to rebut a prima facie case. For example, if a person may be struck because of his occupation without any explanation why the occupation is significant to the case, a prosecutor can justify any exclusion merely by giving the person's occupation as his reason. Of course, if there is nothing in the record that might challenge the plausibility of the prosecutor's use of an occupational reason, then there is nothing before the appellate court for review. Furthermore, a mere conclusory statement will always be insufficient, i.e., if the prosecutor states that he struck a minority venireperson because he was a member of the Democratic Party, and does not give a more detailed explanation, this will always be insufficient. On the other hand, if the prosecutor states that he struck the venireman because he was a member of the Democratic Party and the prosecutor further states that he has not had much success with such individuals, and this stands unrebutted or unimpeached, then this will be a sufficient race-neutral reason, provided it is somehow related to the case to be tried. In sum, the prosecutor's reason must be exclusively race-neutral; it must be related to the case to be tried; it must be clear, plausible, and reasonably specific. Whimsical explanations will simply not get the job done.

At the present time, there is not anything of an appellate definitive nature to which trial judges might look in order to properly and with confidence resolve the issue. If the prosecutor's testimony is rebutted, impeached, controverted, disputed, impugned, infragably impeached, etc., then the question should be whether a rational trier of fact would have believed it.

Under *Batson* it is now permissible for the defendant to use evidence gathered solely from his own trial to establish a

prima facie case of the prosecutor's discriminatory use of peremptory challenges. However, *Batson* did not indicate what might constitute a sufficient race-neutral explanation, except to say that it "need not rise to the level justifying exercise of a challenge for cause" and that it must "be related to the particular case to be tried." In this regard, had this Court been presented with a better record in this cause, my conclusion that the prosecutor's reasons that he gave in this cause, as to why he used peremptory strikes on members of the same race as appellant's are implausible, might be different.

It is far from clear that the various standards of appellate review, whose catchwords are bandied about so easily in the Court's opinion, really differ at all from one another in practical effect.[1] Does the so-called "clearly erroneous" standard really require reversal in fewer cases than does the "rational trier of fact" standard? Isn't a clearly erroneous finding of fact always unsupported by the record and, therefore, an abuse of discretion? Won't constitutionally sufficient evidence invariably provide support in the record for a finding of fact? Doesn't a factfinder automatically abuse his discretion whenever the record will not support his finding? Surely no intelligent person really thinks that these so-called standards indeed mean different things as a matter of law any more than they do in fact. Yet we have been willing to let the entire enterprise of appellate evidentiary review turn upon this senseless bickering about which standard is nominally to be applied, when neither one of the parties has bothered to explain, nor could rationally explain, how the kind of review

he advocates actually differs from the one he opposes.

In a *Batson*[2] hearing, the judge is the trier of fact. The fact in issue is whether the prosecutor used one or more peremptory challenges to exclude persons from the jury on account of their race. This is in no sense a question of law. If the prosecutor says that he did not strike venire members because of their race, the defendant is not entitled to relief unless the prosecutor is lying; the chances of his being mistaken about his own motives for exercising a peremptory strike are insignificantly small. If the trial judge believes that the prosecutor is telling the truth, he must overrule the defendant's motion to quash the jury. Accordingly, when this Court or any appellate court reviews the finding of the trial judge, it must necessarily assess the rationality of his judgment about the prosecutor's credibility. Since it is the defendant's burden to prove that the prosecutor in fact exercised peremptory challenges on the basis of race, it is essential under these circumstances that he prove the prosecutor to be lying. If the trial judge nevertheless believes the prosecutor's racially neutral explanation, the defendant's complaint on appeal must necessarily be that the trial judge's belief is against the great weight and preponderance of the evidence.[3] This is true by force of logic, and it makes precious little difference whether one invokes some slogan involving the words "abuse of discretion," "clearly erroneous," "rational trier of fact," or "supported by the record." If the judge abused his discretion, clearly erred, acted irrationally, or was unsupported by the evidence in believing the prosecutor's racially neutral expla-

---

1. The Court's opinion almost concedes this point after nearly 11 pages reviewing federal case law. We then learn that the "supported by the record" standard, adopted by this Court in *Keeton v. State*, 749 S.W.2d 861, 870 (Tex.Crim. App.1988), and applied on original submission in this case, is really no different in principle than the "clearly erroneous" standard of Fed.R. Civ.Proc. 52(a). Naturally, therefore, the Court adopts the latter.

2. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

3. "[W]hen the courts of appeals are called upon to exercise their fact jurisdiction, that is, examine whether the appellant proved his affirmative defense or other fact issue where the law has designated that the defendant has the burden of proof by a preponderance of evidence, the correct standard of review is whether after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust." *Meraz v. State*, 785 S.W.2d 146 (Tex.Crim.App.1990).

nation, then his judgment should be reversed.

It should be, that is, only if this Court is willing to accept for the first time that evidentiary review by an appellate court includes assessing the rationality of a factfinder's conclusions about the credibility of witnesses at trial. Thusfar, to my knowledge, we have not accepted such a proposition, and we should be rather circumspect about doing so now.[4] Both traditionally and as a matter of careful appellate practice, it has always seemed best to regard the credibility of witnesses as a matter largely inaccessible to the appellate courts. Perhaps because we consider the demeanor of witnesses to disclose so much about their honesty, a cold record is thought especially unrevealing on questions of credibility. But whatever the reason, we have always paid ultimate deference to the factfinder's judgments in this area. Until now, they have been officially unreviewable.[5]

This case changes all of that. Our new willingness to assess the credibility of witnesses as an integral part of our appellate evidentiary review is a significant departure from past practice and should be put in better perspective for the bench and bar.

In the first place, a careful reading of the Court's opinion leaves one with the impression that we simply don't believe the prosecutor's testimony. And, in point of fact, we don't. But the trial judge, after all, is the institutional factfinder in such matters, and it has long been the policy of this Court, as it usually is with reviewing courts of last resort, not to substitute its judgment of evidentiary weight or credibility for that of the factfinder. Consequently, whether we think the prosecutor to be lying is largely beside the point. Rather, the only appellate approach with even an arguable claim to legitimacy is one which inquires whether the factfinder was "clearly erroneous," "abused his discretion," "acted irrationally," or was "unsupported by the record" in believing the prosecutor's testimony. Which of these glosses one puts on the project is fundamentally unimportant, since they all come to the same thing. Far more critical is that neither this Court nor the Courts of Appeals become the actual factfinder in such matters. It is essential that the Court's opinion in this case not be understood to authorize such a result.[6]

---

**4.** The majority relies heavily upon definitive interpretation of Fed.R.Civ.Proc. 52(a), by the United States Supreme Court to demonstrate that a federal appeals court may review the credibility of witnesses to some extent:

"Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination."

*Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 529 (1985).

But until *Meraz v. State,* 785 S.W.2d at 154, this Court did not even acknowledge that intermediate appellate courts in Texas have constitutional authority "to resolve questions of weight and preponderance of the evidence[,]" let alone the credibility of witnesses. *See* Tex. Const. Art. V, Sec. 6. And, given that Texas has no rule in criminal cases even remotely analogous to federal rule 52(a), it is a prodigous leap to the conclusion that *Bessemer City* has anything at all to do with the problem confronting us here. In terms of Texas law, which controls evidentiary review in this State, the rule announced by the Court in this case is made of whole cloth.

**5.** This Court has rather consistently declined invitations to pass upon the credibility of witnesses. *E.g., Porter v. State,* 601 S.W.2d 721, 723 (Tex.Crim.App.1980). We have done so whether the trier of fact is a jury, as in *Coe v. State,* 683 S.W.2d 431, 438 (Tex.Crim.App.1984) and *Jackson v. State,* 672 S.W.2d 801, 804 (Tex.Crim.App. 1984), or a judge, as in *Bellah v. State,* 653 S.W.2d 795, 796 (Tex.Crim.App.1983) and *Langford v. State,* 578 S.W.2d 737, 739 (Tex.Crim. App.1979). Usually, the Court simply writes that "[t]he trier of fact is the sole judge of the weight and credibility of the witnesses and may believe or disbelieve all or any part of any witness' testimony." *E.g., Williams v. State,* 692 S.W.2d 671, 676 (Tex.Crim.App.1984). Occasionally, we also hold that such judgments by the factfinder are "binding upon this court." *E.g., Green v. State,* 146 Tex.Crim.R. 469, 176 S.W.2d 333, 334 (1943). But, whatever the language used to express it, the Court invariably has refused to tamper with factfindings that depend upon the credibility of witnesses.

**6.** In *Batson* itself the Supreme Court warned that "[s]ince the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21.

Secondly, I do not regard the Court's opinion to impugn previous case law on the same subject which appears to require a somewhat different approach to appellate review of *Batson* issues. In particular, I remain committed to the method adopted by the Court in *Tompkins v. State*, 774 S.W.2d 195 (Tex.Crim.App.1987).[7] That method does not differ in any relevant particular from the one embraced by the Court in the instant cause, except that we will henceforth seriously entertain the claim on appeal that factual findings should be reversed because they depend upon irrational, unsupported, or clearly erroneous judgments about the credibility of witnesses.[8] I am willing to accede to this new proposition because I believe that the role of appellate courts in this State now encompasses a more critical review of factual findings by judges and juries than ever before. That such review should include not only an evaluation of evidentiary weight but of witness credibility as well, seems fitting in view of our recent precedents. But, a word of warning is still in order.

> This Court and the courts of appeals are principally reviewing courts. We do not substitute our judgments of witnesses' credibility and evidentiary weight for those of the factfinder, but affirm those judgments whenever the record discloses sufficient evidence in their support.

*Tompkins,* 774 S.W.2d at 205.

> [W]e remind trial judges who are confronted with the issue that in their capacities as factfinders the truth of a racially neutral explanation should be judged in part by its plausibility. A trial judge may not abdicate his responsibility to decide whether a peremptory challenge was racially motivated, nor may he leave such questions to an appellate resolution. He is the factfinder in such matters, and must find the facts fairly and judiciously, according to the burdens of proof prescribed by law.

*Tompkins,* 774 S.W.2d at 205.

That we now accept responsibility for the evaluation of credibility findings on appeal should not, therefore, be regarded as reducing the deference owed such findings below the level typically accorded other factfindings on appeal.

With these observations, I concur in the judgment of the Court. Even affording full deference to the trial judge's role as factfinder in this matter, and viewing the testimony and other evidence in a way most favorable to his findings, I too am nevertheless convinced that the credibility of the prosecutor's racially neutral explanations in this case was so undermined by other circumstances reflected in the record, such as are alluded to in the majority opinion, that no rational trier of fact could have believed them. For this reason, I am convinced the finding of the trial judge that the prosecutor did not exercise peremptory challenges in a racially motivated manner was clearly erroneous because so against the great weight and preponderance of the evidence as to be manifestly unjust.

McCORMICK, Presiding Judge, dissenting.

I dissent. In one of the most weakly reasoned and internally contradictory opinions ever to come out of this Court, the

---

**7.** We held in *Tompkins,* 774 S.W.2d at 202 (emphasis added), that:

> "[W]here the accused has the ultimate burden to prove a factual allegation, such as purposeful discrimination in jury selection, by a preponderance of evidence, an appellate court must view the entire record in a manner favorable to the factfinder's determination and reverse only if no rational trier of fact could have failed to find his factual allegation true by a preponderance of evidence."

In light of our subsequent holding in *Meraz,* note 3, *ante,* the underscored language better comports with the Court's present attitude if amended to read: "it is so against the great weight and preponderance of the evidence as to be manifestly unjust." However, I do not regard the two formulations as prescribing essentially different tests, since it seems clear to me that the failure to find a fact is irrational in our system only when it is against the great weight and preponderance of the evidence.

**8.** It will, of course, not escape the notice of practitioners and judges that the underlying rationale for this proposition is by no means unique to the *Batson* context, and cannot rationally be confined to the review *Batson* questions, since it depends for support upon federal rules and case law of general scope and application.

plurality announces not a new standard of review for *Batson* questions but the same old *Keeton* model with a new name.[1] As a result, trial court judges, prosecutors, and the criminal defense bar should be prepared for continuing relitigation of fact questions before this Court.

Having dressed "supported by the record" in a new set of clothes, the plurality opinion states that we really didn't reject the "clearly erroneous" standard in *Keeton,* just the "nomenclature." In other words, the standard of review has been "clearly erroneous" all along, the Court just forgot to inform the bench and bar at the time *Keeton* was delivered. Judge Miller and the plurality, however, never get around to explaining the meaning of "reject" as used in the following quote from *Keeton:*

> "In adopting our own standard for review, we *reject* Alabama's 'clearly erroneous' standard, which is the federal standard for reviewing findings of fact. See Rule 52(a), Federal Rules of Civil Procedure. Nor do we adopt Indiana's abuse of discretion standard. We believe that our focus, as well as that of the trial judge, should be on whether purposeful discrimination was established. We will of course consider the evidence in the light most favorable to the trial judge's rulings and determine if those rulings are supported by the record. If the record supports the findings of the trial judge, they will not be disturbed on appeal." *Keeton,* 749 S.W.2d at 870. (emphasis added).

We rejected the "clearly erroneous" standard. Not one sentence in *Keeton* says otherwise. Evidently, the plurality finds it less embarrassing to misconstrue the law than admit a mistake was made in *Keeton* when we adopted the "supported by the record" standard for review of *Batson* questions. Regarding the *Keeton* standard that is being "modified," Judge Miller announces:

> "Believing this analysis (referring to *Keeton* ) is synonymous with the 'clearly erroneous' standard's analysis, we are

not necessarily indisposed to granting the State's motion for rehearing to the extent that we adopt the 'clearly erroneous' standard from the Federal Rules of Civil Procedure as the standard of review for appellate courts in addressing *Batson* issues." Op. at 721, (parenthetical added).

The plurality, however, fails to cite one case, state or federal, that makes the statement that the analysis employed in the "supported by the record" and "clearly erroneous" standards are synonymous. Judge Miller does spend a half page of string cites trying to convince somebody that a "supported by the record" analysis is the same as used in "clearly erroneous." Op. at 722. The cases cited along with their parentheticals list the conclusions of appellate courts. I cannot find any indication of what analysis took place. Evidently, the plurality believes that if they repeat "supported by the record" and "clearly erroneous" in the same sentence the standards become the same. Judge Miller writes on two occasions that:

> "The phrase 'supported by the record' is found in conjunction with the clearly erroneous standard in a substantial number of cases." Op. at 722.

and continues,

> "While the nomenclature is different, the analysis is essentially the same under each of the three 'standards of review'— clearly erroneous, great deference, supported by the record—and, in fact, the clearly erroneous and great deference standards engage in the same level of review." Op. at 726. (footnote omitted).

The alchemy does not work.

We are finally given a glimpse of what the plurality considers as analysis under the "supported by the record" (now clothed as clearly erroneous) standard when the plurality states that in arriving at the original conclusion in this case:

> "... we analyzed the evidence in this case in the same manner as the Fifth Circuit, *viz:* reviewing the record in its

1. *Keeton v. State,* 749 S.W.2d 861 (Tex.Cr.App.   1988).

entirety by considering the voir dire process including the racial constitution of the venire, the prosecutor's neutral explanations, and appellant's rebuttal and impeaching evidence." Op. at 726.

I take the plurality's explanation of what analysis takes place under their version of "supported by the record/clearly erroneous" at face value. That is, the explanation of the analysis is a telling statement of what role the plurality thinks trial courts play in fact finding in this State. Trial courts do not exist. The plurality's explanation makes it crystal clear that "supported by the record" now "clearly erroneous" involves nothing more than reconsidering the evidence and substituting our judgment for that of the trial court.

The plurality does mention the role of the trial court in the fact finding process—in a footnote. See footnote 18 at op. p. 727. Judge Miller, in that footnote, continues his quest to ignore the role the trial court's findings play in the appellate process. Judge Miller writes:

"As can be seen from a comparison of Presiding Judge McCormick's dissent with the majority opinion on rehearing, appropriateness of which text to highlight, like beauty, is often in the eye of the beholder. In quoting *Anderson*, this opinion emphasizes '[a] **finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed'** because the Supreme Court referred to it as representing the foremost principle in understanding the phrase 'clearly erroneous'. The dissent emphasizes '[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the [court of appeals] may not reverse [it even though convinced that had it been sitting as the trier of fact, it would weighed the evidence differently]....'" Op. at 727.

Judge Miller and the plurality have missed the point.[2] I accept wholeheartedly the requirement that the district court's findings must be supported by the record. My emphasis on the role of the trial court is used in conjunction with the role the appellate court plays in utilizing the "clearly erroneous" standard. What I reject is the notion that "clearly erroneous" means an appellate court reweighs the evidence based on a cold record and then substitutes its judgment for that of the trial court. The plurality opinion never comes to grips with the *primary* role the trial court plays in the workings of the "clearly erroneous" standard.

In *Anderson v. Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), Justice White, discussing the clearly erroneous standard, wrote that although the meaning of the phrase "clearly erroneous" was not immediately apparent, certain general principles governed an appellate court's power to overturn findings of a district court. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. See *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511; see also *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). The "clearly erroneous" standard, however, does not entitle a reviewing court to reverse the trier of fact simply because it is convinced that it would have decided the case differently. A reviewing court must constantly have in mind that their function is not to decide factual issues de novo. *If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently. Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969).

Justice White continued his discussion by explaining the rationale behind the defer-

---

**2.** Any attempt to deemphasize the role of the trial court under the federal clearly erroneous standard is incorrect. See Childress, *"Clearly Erroneous": Judicial Review over District Courts in the Eighth Circuit and Beyond,* 51 Mo.L.Rev. 93 (1986).

ence paid to the trial judge's determinations:

> "The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.... As the Court has stated in a different context, the trial on the merits should be 'the "main event" ... rather than a "tryout on the road."' *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497 [2508] 53 L.Ed.2d 594 (1977). For these reasons, review of factual findings under the clearly-erroneous standard—with its deference to the trier of fact—is the *rule, not the exception."* *Anderson,* 470 U.S. at 574–75, 105 S.Ct. at 1512 (emphasis added).

Finally, the Court noted that when factual determinations hinge on the credibility of witnesses even greater deference is accorded the trial court's findings. See *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).[3] When a trial judge's finding is based on the credibility of witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. *Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512.

In case there is any confusion over the plurality's lack of understanding of how

the "clearly erroneous" standard is supposed to function let us examine the following passage from the plurality opinion.

> "While this evidence was more fully discussed in our original opinion, the dissent raises two factual matters that were not. The first concerns the prosecutor's explanation that he marked the juror information sheets of the black members of the panel not for the purpose of striking them because of their race, but rather as 'landmarks' in the sea of faces on the panel so that he could readily locate non-blacks in the sea by reference to his juror list. The trial court made no finding of fact concerning the reason for the six 'B' marks, but an analysis of the prosecutor's description, quoted in the dissent, of the seating of the panel with Ms. Fuller on row 3 as number 24, puts 2 'landmarks' side by side in row 1, none in row 2, 1 on row 3, 3 on row 4 and none on row 5. While it is theoretically *possible* that a 'landmark' system was the prosecutor's only goal, this 'system' is such a disjointed, unwieldy, and inefficient one that this explanation is hardly *plausible."* Op. at 727.

First, the trial court made a specific finding that the appellant did not by a preponderance of the evidence prove that the prosecutor in this case had engaged in purposeful discrimination in the exercise of the State's peremptory challenges. In other words, the trial court found the prosecutor's explanations credible.

The plurality, unable to accept this, tells us that the prosecutor's "landmark" system doesn't fit their idea of how a landmark system ought to work. The plurality,

---

**3.** This Court has consistently followed the theory in *Wainwright* of deferring to the trial court judge when determinations of bias are based upon demeanor and credibility because those assessments are peculiarly within a trial judge's province. See *Ellis v. State,* 726 S.W.2d 39, 44 (Tex.Cr.App.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1989); *Ransom v. State,* 789 S.W.2d 572, 582 (Tex.Cr.App.1989); *Davis v. State,* 782 S.W.2d 211 (Tex.Cr.App. 1989).

The Supreme Court in *Wainwright* explained the deference paid to a trial judge's determinations citing *Reynolds v. United States,* 98

U.S. 145, 156–57, 25 L.Ed. 244 (1878). The Court noted that the manner of the juror while testifying is oftentimes more indicative of his opinion than his testimony. The trial judge observes the demeanor of a particular witness but may not be able to spread those observations on the record. Thus, the reviewing court should not reverse except in a clear case.

I discern no logical or legal reason for not deferring to the trial court judge's credibility assessments in *Batson* questions when this Court extends that level of deference in the death penalty context.

however, at this point, cannot bring themselves to stating the trial court's tacit approval of the prosecutor's explanation was implausible. They disingenuously state that the prosecutor's explanation was "hardly *plausible*." Op. at 727.[4] Again, I point out that *Anderson* teaches that a proper analysis under "clearly erroneous" demands that the appellate court determine whether the trial court's account of the evidence is "plausible." In this case the plurality has interposed itself between the trial court's findings and is deciding the factual issues de novo without regard for the credibility determinations the trial court made.

The plurality also raises an argument that I have advanced a "combination of reasons" argument that would justify strikes even if not racially neutral. Op. at 727. I have not and do not advocate the proposition that a race neutral explanation negates a race based explanation of a strike. My position is that the trial court may accept reasons for strikes that are influenced by intuitive assumptions, for example, eye contact and demeanor. *Lance*, 853 F.2d at 1181. *Lance* specifically teaches that even though the prosecutor may have accepted a white juror with some characteristics similar to the black persons he rejected, the trial court may still find a permissible strike based on an intuitive basis. In other words, a record does not have to reflect a perfect match as far as compar-

ison evidence to pass constitutional muster. The plurality has chosen the posture that the State's reasons were a pretext, in part, because comparison evidence indicates that the State did not strike all veniremembers close in age to the defendant. Op. on original submission at 726–727. The *Lance* court clearly rejected such a notion. *Lance*, 853 F.2d at 1181. See the discussion, infra, regarding strikes made on multiple grounds.[5]

I now turn to the instant case and apply the federal "clearly erroneous" standard of review. The record reflects that appellant is a black male and that no blacks served on his jury. Seven blacks were on the jury panel. One black was struck for cause; the remaining six blacks were peremptorily struck by the State.[6] Six of the State's ten peremptories were used to strike blacks.

The record also reveals that voir dire was limited to forty minutes per side. Most of the prosecutor's questions to the panel were general in nature with limited individual questioning taking place before the bench on challenges for cause. Appellant's counsel engaged in general questioning with a substantial amount of individual queries to jurors expressing concern over particular questions.

The record in this case also reflects that the trial judge played an active role in questioning the testifying prosecutor as well as moving both parties toward the

---

4. Several pages later the plurality does make a stab at applying their version of clearly erroneous when they do term the race notations of the prosecutor "implausible." Op. at 727.

5. I also point out that on original submission the majority made a point of castigating the State for preparing for the *Batson* hearing that occurred in this case. Op. on original submission at 727. I revisit this point only to comment that the majority's and now plurality's conclusion in this case is in part based on the implication that the prosecutor's explanations were "too good." The plurality is contending the prosecutor's six to eight hours of preparation for the *Batson* hearing was improper and that it necessarily follows that his explanations were not worthy of belief. Of course, not one speck of caselaw is cited to support this proposition.

6. Citing *Forbes, Lance,* and *Williams,* the plurality also intimates that if the State removes all

minority members from a venire that we can assume that intentional discrimination took place. Op. at 728. At the best the presence or absence of minorities on a petit jury is a factor the trial court judge will consider with the rest of the evidence presented by the State and the defendant. Any implication that a proper ratio of minorities to white veniremembers is required for a "good" jury is incorrect. See *Holland v. Illinois*, —— U.S. ——, ——, ——, 110 S.Ct. 803, 804–06, 107 L.Ed.2d 905 (1990) (Rejecting the Sixth Amendment claim that a petit jury has to reflect a fair cross section of the community). Likewise, the Fourteenth Amendment is not the appropriate vehicle for the Fifth Circuit or this court to use to insure that "x" number of a particular type of veniremember is seated. *Batson* is directed to eliminating individual discrimination; not insuring proportional representation of any group on a jury.

development of evidence that would allow for resolution of the *Batson* question. On two occasions the trial court inquired into the prosecutor's rationale for striking jurors either based on occupation or religious preference.[7] The plurality has totally ignored the trial court's role in this case. The trial court judge was not asleep at the wheel; rather, the judge was actively seeking a basis on which to rule as to the question of discrimination.

At the *Batson* hearing, under thorough direct and cross-examination, the prosecutor for the State gave the following reasons for peremptorily striking black jurors. Appellant argues that the State's racially neutral reasons were a sham or pretext and therefore inadequate to rebut his inference of intentional discrimination.

Veniremember No. 7, Gloria Mitchell, was the first black struck. The prosecutor scribbled on her juror information card "HPD," "Vice" and "DPS." The prosecutor testified that these notes indicated that Mitchell had friends in the police department and Department of Public Safety, which would normally make her a good state's juror. Mitchell's responses, however, to defense voir dire questioning, particularly her intonation, left the prosecutor questioning whether she would believe an officer's testimony. The prosecutor testified that he was concerned that Mitchell's connection with some law enforcement officials might predispose her to disbelieve the police witnesses crucial to the case at bar.

Appellant claims, however, that in peremptorily striking Gloria Mitchell the prosecution struck a good State's witness because of her connection with law enforcement. In *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987), the prosecutor's reasons for striking a black venireperson were based on her posture and demeanor which indicated she might respond negatively to the government's case. The record did not suggest that prosecutor's intuitive assumption was based on race. In

*United States v. Lance*, 853 F.2d 1177 (5th Cir.1988), the defendant complained that the prosecutor provided an incredible explanation for a peremptory strike and the trial judge erred by accepting it as true. The *Lance* court noted:

"... [A]lthough the prosecutor may have accepted a white juror with some characteristics similar to the black persons he rejected, the prosecutor also gave reasons for his selection that we are unable to evaluate, such as eye contact and demeanor. Moreover, the vagarious process of choosing jurors need not be controlled by a simple equation; it may be influenced by intuitive assumptions that are not fatally suspect merely because they are not quantifiable, see *Forbes*, 816 F.2d at 1010–11, and by the interplay of various factors, see *United States v. Lewis*, 837 F.2d 415, 417, n. 5 (9th Cir. 1988). Here, the trial judge personally observed the proceedings and found that the prosecutor's explanation for striking two black members of the venire was not a pretext for racial discrimination. We must accept the judge's credibility choice and affirm his finding on these facts." *Lance*, 853 F.2d at 1181. (emphasis in original omitted). Cf. *United States v. Romero–Reyna*, 867 F.2d 834, 836–37 (5th Cir.1989) (remand to trial court for fact findings regarding prosecutor's use of the 'P' rule in striking a minority juror).

Since the trial judge in the instant case was in the best position to observe the proceedings and judge the credibility of the prosecutor giving his explanation I would not disturb his finding.

Next, the State exercised a peremptory challenge against black venireperson No. 8, Sherry Ramsey. The prosecutor testified that he struck Ramsey because of (1) her husband's profession and (2) her age. Since Ramsey was married to a man who worked in a predominately female profession and who was probably a "social worker type," the prosecutor felt that she would

---

7. Trial courts in a capital murder voir dire routinely take over questioning to resolve questions involving juror qualifications. See *Janecka v. State*, 739 S.W.2d 813, 833 (Tex.Cr.App.1987).

Nothing precludes trial court involvement in ferreting out intentional discrimination in the use of peremptory strikes.

not be a good state's juror. In addition, the prosecutor expressed concern about Ramsey's age. She was twenty-four years of age and close to the age of appellant.

Appellant argues that the peremptory strike exercised against Ramsey was not based on her age and points out that the State did not strike six white venirepersons who were also close in age to the appellant. While disparate treatment of jurors with similar characteristics is suspect, the prosecutor in this case gave an alternative explanation that was racially neutral subject to the scrutiny of the trial court.[8] The trial judge was in the best position to make a credibility choice based on the demeanor and behavior of the prosecutor as to the legitimacy of his explanation. Again, relying on the trial court judge's credibility choice I would affirm his finding.

The prosecutor struck veniremember No. 24, Mayrine Fuller. On her juror information form, the prosecutor circled Fuller's occupation of teaching and noted her failure to fill out whether she served on a prior jury. He testified that he struck Fuller because he viewed teachers to be too liberal and forgiving. The record also reflects that the prosecutor struck the only other teacher on the panel, a nonblack.[9] I find no reason that the trial judge's finding that the prosecutor's explanation was racially neutral should be disturbed.

The prosecutor exercised a peremptory challenge to strike Glenda Johnson, veniremember No. 32. The prosecutor testified that he did so because Johnson indicated that Pentecostal was her preferred religion. The prosecutor believed this to be a "fringe type" religion because Pentecostals "speak in tongues" and do some things "out of the ordinary."

The prosecutor also peremptorily struck veniremember No. 37, Willie Lee Hunt, because of Hunt's involvement in the Church of God, a religion the prosecutor knew nothing about. Hunt was the only veniremember who indicated a preference for this particular denomination. Also marked on Hunt's information card was Hunt's failure to respond to whether he had been an accused in a criminal case. The prosecutor further testified that he could not specifically remember whether he struck Hunt merely because of Hunt's religious preference, or whether the omitted portion of the information form was also a consideration.[10] The prosecutor, however, testified that Hunt's failure to respond to whether he had been accused in a criminal case could have been a factor in the exercise of his strike.

Appellant intimates that the prosecutor's peremptories exercised against venirepersons Johnson and Hunt based on their religious affiliation were suspect.

The trial court, however, found that the prosecutor's explanations regarding his reservations about what he considered "fringe type religions," and what kind of jurors practitioners of those religions would make, were racially neutral. In addition, the prosecutor struck a nonblack on the basis of his religion, opining that he thought the religious affiliation made the juror too liberal. The trial court's finding of race neutrality in the exercise of these strikes should not be disturbed.

Last, the State exercised a peremptory challenge on veniremember No. 39, Reginald Ardoin. The prosecutor testified that he was concerned that Ardoin was only twenty-one years of age and that Ardoin's spelling on the information form was very poor. Specifically, Ardoin misspelled Riv-

8. *Lance,* 853 F.2d at 1181.

9. In *Slappy v. State,* 503 So.2d 350, 355 (Fla. App. 3 Dist.1987), the reviewing court rejected the prosecutor's explanation for a peremptory strike based on an assumed employment group bias. The reviewing court concluded that the prosecutor excluded a black teacher on the basis of race because a nonblack teacher was not challenged.

10. The Fifth Circuit in *Forbes,* 816 F.2d at 1011, no. 7, citing *United States v. David,* 803 F.2d 1567, 1571 (11th Cir.1986), noted that the failure by a prosecutor to explain every peremptory strike of black jurors is not necessarily fatal to the prosecutor's ability to rebut the prima facie case. Nor will the explanation of most of the strikes on nonracial grounds necessarily satisfy his burden.

erside General as "Riverside Genral" and misspelled his religious preference of Baptist as "Bapaitsm." The record reflects that Ardoin was the only veniremember under the age of twenty-four. The prosecutor expressed concern over Ardoin's ability to act as a competent juror based on an apparent lack of educational skills.

Appellant contends that the prosecutor's explanation for striking venireperson Ardoin was not racially neutral. Appellant, however, does not provide any basis for undermining the trial judge's determination that the strike was exercised in a racially neutral fashion.

Appellant also argues that the prosecutor's indication of the race of black veniremembers on the juror information forms provides evidence of the State's intentional discrimination that was not rebutted. At the *Batson* hearing the prosecutor explained that he marked "B" on the juror information forms not for purposes of peremptory strikes, but rather for purposes of visual placement of the members on the panel. The prosecutor explained the notations as follows:

"[I]t helps a lot just in placing faces and placing jurors, not just placing the minority jurors but when you are sitting in front of a panel with 50 people trying to figure out who juror No. 26 is, frankly, looking at my sheet, I know that Juror No. 26 is two down from the black female that at the time would have been in the third row. That's pretty much the basis for laying out, I guess, landmarks of sorts in the entire jury panel.

\* \* \* \* \* \*

"It's· helpful, more helpful after all the voir dire when I'm sitting up at counsel table when I look up and refresh my memory of faces of what people have done during the voir dire."

The record also reflects that the prosecutor made other notations on several of the juror information forms which were marked with "B." Professions were circled, unanswered portions of the forms were marked, and veniremember statements made during voir dire were noted.

The prosecutor had also marked "O" to designate a juror of the Oriental race.

Appellant attempted to establish on cross-examination of the prosecutor that the only explanation for marking "B" on the juror information cards was to identify jurors for strikes on the basis of race. Appellant was not successful.

Had the prosecutor intended to strike venirepersons based solely on the basis of race then no additional notations or marks of any kind on the juror information cards would have been necessary in order for the State to exercise peremptory strikes in a discriminatory manner. The trial court judge observed the demeanor and behavior of the prosecutor throughout the *Batson* hearing and was in the best position to determine whether the prosecutor had engaged in impermissible conduct. I find no reason in the record for overruling the trial judge's credibility choice.

Last, I point out what has been painfully obvious to me throughout the entire plurality opinion. The plurality's "clearly erroneous" standard is "nomenclature" for an "analytic tool" based on subjectivity with lip service paid to the role of the trial court. After engaging in 14 pages of "analysis" the plurality states:

"[I]n the present cause appellant's detailed presentation of evidence indicating that the black members of the venire were treated differently than the white members <u>sufficiently rebuts</u> the prosecutor's neutral explanations for his peremptory challenges and supports a holding that the trial court clearly erred in finding no purposeful discrimination in the jury selection process in appellant's trial." Op. at 728 (underline added).

The plurality sitting as a court de novo has reweighed the evidence and decided it "sufficiently rebuts" the prosecutor's neutral explanations. I dissent and dissent again. "Sufficiently rebuts" is not "nomenclature" for the federal standard of "clearly erroneous."

Under the federal clearly erroneous standard, there is no basis for upsetting the trial court's findings in the instant case. I would grant the State's motion for rehear-

ing, affirm the Court of Appeals, overrule the *Keeton* standard of review and adopt the federal clearly erroneous standard of review for *Batson* hearings.

BERCHELMANN, Judge, dissenting.

I dissent for the reasons stated in my dissenting opinion to the Court's opinion on original submission. Page 716–717 (Berchelmann, J., McCormick, P.J., White, J., dissenting).

Whether this Court chooses to call its standard of review "supported by the record," as the majority of this Court did in *Keeton v. State*, 749 S.W.2d 861, 870 (Tex. Cr.App.1988), or whether a majority of this Court now chooses to call the *Keeton* standard "synonymous with the 'clearly erroneous'" analysis, page 712 (opinion on rehearing), or whether this Court decides that the clearly erroneous standard is separate and distinct from the *Keeton* standard, page 742 (McCormick, P.J., dissenting) (opinion on rehearing), the end result in this cause should be the same. This Court should defer to the trial court's findings.

The trial court's findings are "supported by the record" for the reasons set forth in my dissenting opinion on original submission. Page 717, supra. These same reasons are correctly cited by the Presiding Judge in his dissenting opinion on motion for rehearing to demonstrate that the findings are not "clearly erroneous." Page 742, supra.

For these reasons, I respectfully dissent to the majority's repeated refusal, through whichever semantic distinction it chooses at the moment, to defer to the findings of the trial judge in the case at bar.

WHITE, J., joins this opinion.